**Edward F. DOUGHERTY, Plaintiff,**

v.

**Marion S. BARRY, Jr., et al.,
Defendants.**

**Civ. A. No. 81–297.**

United States District Court,
District of Columbia.

March 7, 1985.

David Lesser, Robert B. Bell, Washington, D.C., for plaintiff.

Metcalfe C. King, Asst. Corp. Counsel, Washington, D.C., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

THOMAS F. HOGAN, District Judge.

Plaintiff, Edward F. Dougherty, a former District of Columbia firefighter, seeks injunctive and monetary relief for defendants' alleged retaliation against him when he was employed by the District of Columbia Fire Department ("Fire Department"). Specifically he claims that defendants failed to promote him from Battalion Fire Chief to Deputy Fire Chief because he had filed administrative complaints alleging racial discrimination in the promotion of other firefighters and because he had participated in a firefighters' rally which was organized to voice criticism of the Fire Department. He seeks relief under the First Amendment pursuant to 42 U.S.C. § 1983 and under the District of Columbia Human Rights Act, D.C.Code §§ 1–2501, et seq. (1981).

The Court conducted a three day trial of this action and after reviewing the trial transcript, exhibits and post trial briefs of the parties, issues these Findings of Fact and Conclusions of Law pursuant to Feder-

al Rule of Civil Procedure 52 and enters judgment in favor of the plaintiff.

## FINDINGS OF FACT

1. Plaintiff Edward F. Dougherty joined the District of Columbia Fire Department as a firefighter on March 9, 1953. He was promoted to Sergeant on February 3, 1963, Lieutenant on May 9, 1965, and Captain on June 4, 1967. On May 14, 1972, plaintiff was promoted to Battalion Fire Chief in the Department's Fire Fighting Division. Plaintiff was designated as an Acting Deputy Fire Chief on June 5, 1975 and remained so designated until his retirement on August 30, 1980. (Joint List of Stipulated Facts, "Stipulated Facts" ¶ 1.)

2. Plaintiff originally sued Marion S. Barry, Jr., the Mayor of the District of Columbia, Elijah B. Rogers, the City Administrator, Norman Richardson, and the District of Columbia. Prior to trial, plaintiff dismissed his claim against Norman Richardson. He proceeded to trial against the remaining defendants.

3. Defendant Marion S. Barry, Jr. has been the Mayor of the District of Columbia since January 1979. Defendant Elijah B. Rogers was the City Administrator of the District of Columbia from January 1979 to May 1983. Norman Richardson was the Chief of the Fire Department from January 1980 to March 1982. (Stipulated Facts ¶¶ 3, 4, 5.)

4. The District of Columbia is divided geographically into eight firefighting battalions. Each battalion is headed by three Battalion Fire Chiefs, each of whom is in charge of one of three platoons assigned to it. The three platoons, which are roughly equal in number of firefighters, are regularly rotated to "day duty" (8 A.M. to 6 P.M.), "night duty" (6 P.M. to 8 A.M.) and off-duty. The Battalion Fire Chief is generally the Department's highest field supervisory rank. Battalion Fire Chiefs report directly to the next highest permanent ranking officers, the Deputy Fire Chiefs. The Fire Department is headed by the Fire Chief. (Stipulated Facts ¶¶ 6, 8, 9.)

5. Pursuant to Fire Department regulations, a Battalion Fire Chief may be temporarily assigned as an Acting Deputy Fire Chief in order to gain experience when a Deputy Fire Chief is absent. Plaintiff served in such a capacity on various occasions from June 5, 1975 until his retirement in 1980. (Stipulated Facts ¶ 10.)

6. Promotions to the positions of Sergeant, Captain and Lieutenant, positions below the rank of Battalion Fire Chief, are based upon scores obtained on competitive examinations. Promotions to the ranks of Battalion Fire Chief and above within the Fire Department are committed to the discretion of the Mayor. D.C.Code § 4–302 (1981). All Battalion Fire Chiefs are eligible for promotion to Deputy Fire Chief. D.C.Code § 4–302. The positions of Assistant Fire Chief and Deputy Fire Chief are exempt from Civil Service Merit promotions. D.C.Code 4–302. This statute, which has been in effect since 1920, provides no objective criteria to be used in making such promotions.[1] (Stipulated Facts ¶ 2, 6, 7.)

7. As Mayor of the District, Marion S. Barry, Jr. appoints and maintains supervisory control over the City Administrator and the Chief of the Fire Department. He has delegated the task of selecting individuals for promotion to the positions of Deputy Fire Chief and Fire Chief to his City Administrator, Elijah B. Rogers (Testimony of Rogers, July 20 Transcript, "July 20 Tr.," 5–7.)

8. The practice usually followed in making promotions from the rank of Battalion Fire Chief to Deputy Fire Chief is for the Chief of the Fire Department to recommend certain eligible candidates to the City

---

1. Defendants had earlier moved to dismiss the complaint contending that since there are no statutory criteria controlling the Mayor's decisions, plaintiff had failed to state a claim upon which relief could be granted. In a memorandum opinion before this case was assigned to this Court, Judge Charles R. Richey denied the motion holding that "this discretion does not automatically allow executive officials to violate the United States Constitution or 42 U.S.C. § 1983 in exercising such discretion." Mem. Op. of September 14, 1981, *slip op.* at 2 (citations omitted).

Administrator and for the City Administrator to challenge the rationale of these selections. (*Id.* at 5.) Defendant Rogers considers the positions of Battalion Fire Chief and above in the Fire Department to be of a management or policy-making nature. (*Id.* at 7.) In deciding whether to accept those candidates the Fire Chief has recommended for promotion, the City Administrator "looks for people who have demonstrated that they can manage complex situations, individuals and organizations." (*Id.* at 6.)

9. Edward Eberhard, the Administrator for the Fire Department, explained that Battalion Fire Chiefs are evaluated either "satisfactory" or "unsatisfactory" every two years while they are at step one to step four. (Eberhard, July 19 Tr., 130–31.) Plaintiff received a satisfactory rating on each of his evaluations. (Dougherty, July 18 Tr., 30–31.) After 1978 he received no further evaluations since he was then at the fourth step of the Battalion Fire Chief rank. *Id.*

10. A Battalion Fire Chief is in charge of from three to six firehouses, from three to eight companies and thirty-five to sixty-five firefighters. They are responsible for the training, pay, leave and other administrative activities of the firefighters under their supervision. (*Id.* at 29.) While he was a Battalion Fire Chief, Dougherty served on the departmental board of awards, and on the trial and disciplinary trial boards as both a member and chairman. (*Id.* at 30.)

11. An Acting Deputy Fire Chief assumes all of the duties of the Deputy Fire Chief when the Deputy Fire Chief is unavailable. (*Id.* at 31.) Dougherty served as an Acting Deputy Fire Chief most frequently in the Firefighting division but also the Training, Apparatus and Fire Prevention division. (*Id.* at 32.) Dougherty served as an Acting Deputy Fire Chief on 12 shifts in 1975, 33 shifts in 1976, 24 shifts in 1977, 47 shifts in 1978, 47 shifts in 1979 and 27 shifts in 1980 before his retirement on August 30, 1980. (Plaintiff's Exhibit ("Pl. Ex.") 79 and Testimony of Cerretani, July 20 Tr., 45–46.)[2]

12. In early June of 1979, plaintiff was the senior Battalion Fire Chief and the senior Acting Deputy Fire Chief. (Dougherty, July 18 Tr. at 32.) The senior Battalion Fire Chief is the "Battalion Fire Chief among all the Battalion Fire Chiefs that is senior in rank." *Id.*

13. In June of 1979, Norman Richardson, a black firefighter, was promoted to the rank of Deputy Fire Chief, Training Division; he was the nineteenth Battalion Fire Chief in rank on the Battalion Fire Chief seniority roster. (*Id.* at 32–33.) Richardson had never been designated to serve as an Acting Deputy Fire Chief. ("Stipulated Facts," ¶ 11.)

## PLAINTIFF'S ADMINISTRATIVE COMPLAINTS AND "PASSING OVER" IN FIRE DEPARTMENT PROMOTIONS

14. In June, 1979, plaintiff, on behalf of himself and sixteen other white Battalion Fire Chiefs, filed a complaint with the Fire Department's Equal Employment Opportunity ("EEO") officer in June, 1979, chal-

---

**2.** Defendants objected to the testimony of plaintiff's rebuttal witnesses, Michael Cerretani, who identified a document he compiled which listed the years and corresponding number of occasions on which plaintiff served as an Acting Deputy Fire Chief, and Edward Eberhard. In support of their position, defendants cited *Smith v. Conley*, 584 F.2d 844 (9th Cir.1978). That case recognizes that the trial court has discretion to order the presentation of proof under Federal Rule of Evidence 611. It also recognizes however that it is proper for the Court to allow the presentation of evidence on rebuttal where "the proffered testimony would have significantly increased the cogency of plaintiff's case if received in rebuttal." *Id.* at 846.

In this case defense counsel stated it was not defendants' position that Mr. Dougherty was not qualified to be promoted to Deputy Fire Chief. Nevertheless there was evidence introduced that plaintiff had been passed over on various occasions when he was eligible for promotion. Plaintiff proffered the duty logs and the Court accepted the exhibits (Pl. Exs. 79 & 80) and testimony of Michael Cerretani and Edward Eberhard to counter the inference that though eligible plaintiff did not possess sufficient experience to be promoted to Deputy Fire Chief.

lenging Norman Richardson's promotion on grounds of racial discrimination. After an investigation, the Department's EEO officer denied the complaint. (Stipulated Facts, ¶ 12; Dougherty July 18 Tr., 33.)

15. In July, 1979, plaintiff filed a complaint on the same grounds with the District of Columbia Office of Human Rights ("OHR") on behalf of himself and sixteen other white Battalion Fire Chiefs against the Fire Department, Mayor Barry, Elijah Rogers and the District of Columbia. Plaintiff filed the complaint because he felt that Norman Richardson "had not been—or was not any place near the senior Battalion Fire Chief and he was promoted solely on his—on the basis of his race." (Dougherty, July 18 Tr., 33.)

16. Plaintiff's complaint alleged that defendant Richardson was promoted to Deputy Fire Chief and that plaintiff was denied promotion to that post as a result of unlawful racial discrimination for which the Fire Department and defendants Barry, Rogers and the District of Columbia were responsible. Plaintiff's complaint further alleged that the racial discrimination was made possible by the fact that the Fire Department's promotion system lacked any objective standards or guidelines. (Stipulated Facts ¶ 13.)

17. Plaintiff testified that he believed he was sent a notice to appear for a fact finding conference with regard to his July, 1979 OHR complaint in October 1979 but that conference was cancelled. (Dougherty, July 18 Tr., 34.)

18. In January 1980, Mayor Barry announced the promotion of Norman Richardson from Deputy Fire Chief to Fire Chief. (Stipulated Facts ¶ 14.)

19. In January 1980, the promotions of Joseph Kitt, Theodore Coleman and Alphonse Torre from Battalion Fire Chief to Deputy Fire Chief were announced. (Dougherty, July 18 Tr. at 34.) Plaintiff amended the OHR complaint he had filed in July 1979 to allege that the promotions of Joseph Kitt and Theodore Coleman had been made on the basis of their race. (*Id.*) At the time of their promotions, Joseph Kitt was ranked 19th on the seniority list

of Battalion Fire Chiefs and Theodore Coleman was ranked 20th on that list. (Dougherty, July 18 Tr. at 34; Defendants' Exhibit ("Def. Ex.") 3.) Plaintiff testified that he did not amend his complaint to challenge the promotion of Alphonse Torre, a white firefighter, because Torre was ranked fourth on the seniority list and "he was close." (Dougherty July 18 Tr. at 66–67; Def. Ex. 3.) At the time of the January 1980 promotions, plaintiff was the senior Battalion Fire Chief (Finding of Fact, ¶ 12).

20. Plaintiff testified that his OHR complaint had no adverse effect on his work and it did not affect his relationship with his subordinates or his superiors in the Fire Department. (Dougherty, July 18 Tr. at 35.) There was no evidence proffered by defendants that his OHR complaint disrupted plaintiff's work or the efficiency of the Fire Department.

21. Plaintiff was "passed over" on three occasions before he filed his July, 1979 OHR complaint. (Dougherty, July 18 Tr. at 69.) "Passing over" is a term used to describe the promotion of firefighters with less seniority before those with greater seniority. (*Id.* at 63, 69; Testimony of Eberhard, July 19 Tr. at 85.) Before filing his OHR complaint, plaintiff was passed over by Chief Healy (white), Chief Hanback (white) and Chief Logan (black). (*Id.* at 69, Def. Ex. 3.)

22. Plaintiff testified that when he was passed over by Chief Hanback and Chief Logan he asked then Chief Jefferson Lewis why he had been passed over in promotions. Plaintiff testified that Chief Lewis acted evasively but told him that he had a "tremendous outside pressure." Plaintiff interpreted this to mean that Chief Lewis was getting some pressure "either from he Mayor's office or from citizens' groups or whatever." (Dougherty, July 18 Tr. at 67.)

23. Plaintiff recalled that Battalion Fire Chiefs DelBalzo, Torre and Gates had been promoted to the Deputy Fire Chief position after being passed over for promotion to that rank. (*Id.* at 70) According to plaintiff all Battalion Fire Chiefs have eventually been promoted to Deputy Fire Chief

unless they retire prior to that promotion. (*Id.* at 72) Plaintiff could not recall any instance where persons on the Acting Deputy Fire Chief list were not promoted to Deputy Fire Chief (*Id.* at 72–73).

24. In defendants' behalf, Edward Eberhard testified that he knew of three instances where Battalion Fire Chiefs had been promoted directly to Assistant Fire Chief; these were the promotions of Fire Chiefs Glass, Lewis and Burger. (Testimony of Eberhard, July 19 Tr. at 85–87.) These officers had all been senior to Mr. Dougherty. (*Id.* at 117) Mr. Eberhard explained that approximately twelve officers who had become Battalion Fire Chiefs after plaintiff had "passed over" plaintiff in their promotions from Battalion Fire Chief to Deputy Fire Chief (*Id.* at 97–100; Def. Ex. 3) and that blacks and whites had passed over each other in promotions. (*Id.* at 100) On cross examination, Edward Eberhard testified that of the twelve officers he had mentioned only Chiefs Healy, Logan and Jeffrey passed over plaintiff prior to plaintiff's filing of his discrimination complaint. (*Id.* at 118–119) The only person who was Fire Chief when Healy, Logan and Jeffrey were promoted was Chief Jefferson Lewis. (*Id.* at 119–120) Additionally on cross examination Mr. Eberhard testified that while Battalion Fire Chiefs were passed over on from one to three occasions, they were eventually promoted to Deputy Fire Chief. (*Id.* at 121–126) In response to the Court's questioning concerning those Battalion Fire Chiefs who were not promoted to Deputy Fire Chief, Mr. Eberhard stated that this group of firefighters included those Battalion Fire Chiefs who were named as plaintiffs in plaintiff's OHR complaint and those who had retired early. (*Id.* at 133–136)

25. On or about August 26, 1980, five promotions were announced from the ranks of Battalion Fire Chief to Deputy Fire Chief. (*Id.* at 70; Def. Ex. 3 (noting promotion dates of 10/5/80); Testimony of Edward Eberhard, July 19 Tr. at 119.) These were Officers Granados, Shaffer, O'Connell, Burks and Clarke and they are all white (*Id.*). Respectively, they occupied the first, second, third, fourth and fifth positions of seniority below plaintiff. (*Id.* at 45, 70) These men had been passed over previously by Chiefs Richardson, Kitt and Coleman and had been named in plaintiff's OHR complaint. (*Id.* at 71) According to plaintiff, these men did not take an active part in the prosecution of his OHR complaint. (*Id.*)

## THE MAY 1980 FIREFIGHTERS' RALLY AND SUBSEQUENT EVENTS

26. In early May 1980 employees of the Fire Department staged a rally at the District Building. The rally was reported the following day in the Washington Post. (Stip. Facts ¶ 15.) The rally was organized to protest the budget cuts of the City Administration, interference by the City Administration in the Fire Department administration, and racial discrimination in the promotion system. (Dougherty, July 18 Tr. at 36.) According to plaintiff the men formed a line, walked peacefully and carried placards around the District Building several times; some of the council members came down to speak to the rally participants. (*Id.*) Plaintiff's photograph was taken at the rally and was prominent in the Washington Post the next day. (*Id.*) City Administrator Elijah Rogers made reference to the fact that the rally participants had made personal attacks against Mrs. Barry during the rally. (Rogers, July 20 Tr. at 36.) Defendants did not ask the rally participants whether those comments had indeed been made, nor did plaintiff contradict Rogers' statement. The Court finds that even though some such comments may have been made, they played a minor role in the overall purpose for which the rally was organized and conducted and were not the main reason that the Administration called a meeting with the firefighters several days later.

27. William Phillips, a former Battalion Fire Chief, testified that he was one of approximately three hundred officers and firefighters who attended the rally. (Phillips, July 19 Tr. at 9.) He testified that the Union organized the rally because they felt "the problems in the Fire Department at that time were caused in large measure by

(the Barry) administration." (*Id.*) He explained that he

> had worked through the system for several years to try to effect changes that were sorely needed. The morale of the Fire Department was at an all-time low. The men were frustrated. I worked with them every day and I knew this. I had to resolve their problems and I had reached a point where I could no longer function in my job, and this was my effort to accomplish the changes.

(*Id.* at 10.)

28. A few days after the rally, Mayor Barry and City Administrator Rogers called a meeting at the District Building with Norman Richardson and the other chief officers in the Fire Department, including plaintiff. During the meeting, defendants Barry and Rogers expressed unhappiness about the rally. (Stipulated Facts ¶ 15.) Plaintiff stated that Mayor Barry and Elijah Rogers essentially told those at the meeting that "they were either on the team or could get off" and that Mayor Barry had made recent promotions of blacks to higher level positions to compensate for previous discrimination in promotion against them. (Dougherty, July 18 Tr. at 37–38.)

29. Andrew Buckler, Jr., a witness called by plaintiff, had served in the Fire Department from June, 1958 to August 30, 1980, when he retired at the rank of Battalion Fire Chief. (Testimony of Buckler, July 18 Tr. at 91, 106.) Mr. Buckler had known plaintiff for 20 years and had been named as a plaintiff in Dougherty's OHR complaint. Mr. Buckler testified that all Battalion Fire Chiefs and above were told to be at the meeting. (*Id.* at 94) Mr. Buckler testified that Mayor Barry explained that he was "dedicated to racial balance in all levels of promotion in the Fire Department, that we had two choices—either get on the team and be an active player or that we should retire." According to Mr. Buckler, Elijah Rogers stated that "if he was the Fire Chief that he would fire" half of us for activities that had occurred a few days before that. (*Id.* at 97) When City Administrator Rogers testified he explained that Mayor Barry did

not expect those who served at the pleasure of the Mayor to participate in rallies against his policies and to encourage other individuals to participate in rallies as it relates to his policies. (Rogers, July 20 Tr. at 34–36.) According to Rogers, once the Administration made the final decision the Administration expected the senior people to carry it out. In short, they felt it was inappropriate and unprofessional for senior members of the Fire Department to participate in those rallies. (*Id.* at 36)

30. While Mayor Barry was talking during the meeting, plaintiff shook his head negatively; at the end of his talk, Mayor Barry asked plaintiff to identify himself and tell why he had shaken his head. (*Id.* at 98; Dougherty, July 18 Tr. at 40.) Plaintiff responded by giving his name and rank and explained that in his twenty-seven years in the Fire Department he did not know of any racial discrimination against blacks in the competitive written examinations needed to progress from Sergeant to Lieutenant to Captain. (*Id.* at 40; Buckler at 98–99.)

31. At the end of May, 1980, plaintiff filed a complaint with the Office of Revenue Sharing ("ORS") in the Department of Treasury alleging racial discrimination in Fire Department promotions in violation of the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1242. In early June 1980, the Civil Rights Division of the ORS notified Mayor Barry of plaintiff's complaint pursuant to 31 C.F.R. 51.61. In late June 1980, Norman Richardson advised defendant Rogers of ORS' notification and the fact that plaintiff's allegations were being investigated by the OHR. Elijah Rogers responded to the notification from the Civil Rights Division of the ORS. (Stipulated Facts ¶ 18.)

## INVESTIGATION OF PLAINTIFF'S OHR COMPLAINT

32. In May 1980 a fact-finding conference was held concerning plaintiff's July 1979 OHR complaint. (Dougherty, July 18 Tr. at 34.) Plaintiff, Edward Eberhard, who represented the Fire Department, and

Ms. Linda Hemby, an Equal Opportunity Specialist and the OHR investigator, appeared at the conference. (*Id.* at 35; Hemby, July 18 Tr. at 115.) None of the other Battalion Fire Chiefs on whose behalf plaintiff filed the complaint were present. According to plaintiff, he "had done most of the paperwork and . . . [had] carried the burden of the complaint on my own." (*Id.*) Neither Mayor Barry nor Mr. Rogers was present. Based on Ms. Hemby's experience as an investigator, it was unusual for the respondent not to appear at a fact-finding conference. (Hemby, July 18 Tr. at 119.)

33. An OHR fact-finding conference is an administrative step preliminary to a decision on whether "probable cause" exists to support a complaint; under OHR's procedures, if probable cause is found and conciliation fails, a public hearing on the complaint is held. (Stipulated Facts ¶ 16.)

34. At the May 1980 fact-finding conference, Linda Hemby presented a list of thirteen questions to be resolved regarding plaintiff's complaint. Ms. Hemby stated that she would attempt to contact defendants Barry and Rogers regarding the questions. (Stipulated Facts ¶ 17; Pl. Ex. 12.)

35. Linda Hemby was employed by one of two investigative units in the enforcement division. Her supervisor reported to an enforcement coordinator, who in turn reported to Mrs. Shelton, the Director, who in turn reported to Elijah Rogers. (Hemby, July 18 Tr. at 116.)

36. According to Ms. Hemby respondents Barry and Rogers were notified of Dougherty's OHR complaint shortly after it was filed as well as in September 1979 when the Office requested information from them. According to Ms. Hemby, the Fire Department met with employees of OHR in October 1979 but from that time until the May 1980 fact-finding conference no further action had been taken on the case. (Hemby at 119–120.)

37. Since neither Mayor Barry nor Elijah Rogers was present, Ms. Hemby stated she would draft interrogatories to be sent to them. (*Id.* at 120, 123.) Ms. Hemby advised Mr. Eberhard at the conclusion of

the conference that she was leaning toward a finding of probable cause based on the evidence, and she included this in a report she filed. (*Id.* at 121; Pl. Ex. 12.) On the several occasions when Mr. Eberhard telephoned Ms. Hemby after the conference she would advise him that she was still leaning toward a finding of probable cause. (Hemby at 123–124.) After the conference Ms. Hemby advised Doris Ridgely, who had handled the case before Ms. Hemby, and Lycurgus Hill, the enforcement coordinator, that she was leaning toward a finding of probable cause. (*Id.* at 125–126.)

38. Although Ms. Hemby had prepared the interrogatories after the May 9th conference, they were forwarded for Director Shelton's review before they were authorized to be sent out. The interrogatories apparently were lost in transit within the office but in any event were not prepared for transmittal nor typed in final form until Ms. Hemby undertook to finalize and send them herself at the end of July. (Hemby at 129–133; Pl. Exs. 15, 18, 60.) On July 28, 1980, the OHR served on Mayor Barry, Elijah Rogers and on former Fire Chief Jefferson Lewis written interrogatories regarding plaintiff's complaint. The deadline for answering the interrogatories was August 8, 1980. (Stipulated Facts ¶ 21; Pl. Ex. 21.)

39. Defendant Rogers received the interrogatories and later sent a letter to Anita Shelton, Director of the Office of Human Rights, acknowledging receipt. (Testimony of Rogers, July 20 Tr. at 27–28; Pl. Ex. 26.)

40. In June 1980, a "D.C. Government Unit" was created within the Office of Human Rights to handle cases involving discrimination complaints against the District of Columbia. Doris Ridgely was appointed Supervisor of the D.C. Government Unit in June 1980. (Stipulated Facts ¶ 19.)

41. In early July 1980, Doris Ridgely notified Ms. Hemby that plaintiff's case would not be reassigned to the D.C. Government Unit because of its complexity.

42. After Ms. Hemby sent out the interrogatories she showed Lycurgus and her supervisor in early August the draft of a Full Investigative Report (FIR) which she had prepared for the case but which she was waiting to finalize until she received the interrogatory answers. Ms. Hemby's report concluded that there was "probable cause." (Hemby at 136–139.)

43. On August 7, 1980 Mayor Barry requested an extension of time from the OHR to answer the interrogatories. An extension to August 20, 1980 was granted. (Stipulated Facts ¶ 23.)

44. On August 13, 1980 Director Shelton of the OHR reassigned plaintiff's case from Linda Hemby to the D.C. Government Unit. At that time, former Fire Chief Lewis had answered the OHR interrogatories but defendants Barry and Rogers had not. (Stipulated Facts ¶ 24.)

45. As of August 13, 1980 Ms. Hemby was prepared to conclude her investigation and make a finding of probable cause. She believed she was taken off the case because she was going to make a probable cause finding. (Hemby at 142; Pl. Ex. 25.)

46. Ms. Hemby had previously filed a complaint with the Office of Revenue Sharing and the EEOC against the District of Columbia. (Hemby at 154.)

47. Despite Ms. Hemby's prior experience in investigating complaints filed by members of the D.C. Police Department in which the lack of objective criteria for promotion above a certain rank was cited, she testified that she based her finding of probable cause on the evidence produced at the fact-finding conference. (Hemby at 145–147, 149–153.) The Court has credited her testimony.

## CONSIDERATION OF PLAINTIFF FOR PROMOTION IN AUGUST 1980

48. Plaintiff met with Norman Richardson who interviewed him for the position of Deputy Fire Chief on or about August 4, 1980. (Dougherty, July 18 Tr. at 42.) He believed that Richardson asked him how long he planned to stay with the Fire Department; Dougherty replied that he intended to stay at least through the first administration of Mayor Barry. (*Id.* at 43.) Dougherty stated that Richardson told him he had no complaints about Dougherty's performance and that he would promote him to Deputy Fire Chief if he was permitted to do so. (*Id.* at 43, 44.)

49. On or about August 26, 1980 plaintiff learned of the promotions that had been made to Deputy Fire Chief. When plaintiff asked Chief Richardson why he had not been promoted, Chief Richardson told plaintiff that he had recommended him for promotion on two occasions and that plaintiff had not been promoted because of his complaint. (*Id.* at 47.) Plaintiff recalled that he asked Chief Richardson whether dropping his OHR complaint would aid his chances of promotion. Richardson replied that he did not think so and commented "They seem very much resolved and very strong in their resolve not to promote you." (*Id.* at 47–48.) Plaintiff went home on that day, discussed his concerns of non-promotion and fears of harassment with his wife and decided to retire. (*Id.* at 48.)

50. Chief Richardson testified that he met with Elijah Rogers alone in the City Administrator's office regarding the August promotions and that he recommended to Rogers that plaintiff be promoted to Deputy Fire Chief because he was qualified for the job. (Richardson, July 18 Tr. at 76.) Richardson stated that Rogers more or less replied that he didn't think Chief Dougherty should be promoted. (*Id.* at 77.) In response to a hypothetical question on cross examination, Richardson testified that if Dougherty had been recommended for promotion to the earlier Fire Chief, Jefferson Lewis, that Rogers, as the City Administrator, would have had independent information concerning plaintiff. (*Id.* at 78.) When Elijah Rogers testified, however, he stated that neither Jefferson Lewis as Fire Chief nor Jack Devire as Acting Fire Chief had recommended plaintiff for promotion to Deputy Fire Chief. He also testified that he did not discuss plaintiff with Chief Lewis and did not remember having such discussions with Lewis' prede-

cessor, Burton Johnson. (Rogers, July 20 Tr. at 29–32.)

51. Battalion Fire Chief Gerald Eckholm, a member of the Fire Department for twenty-five (25) years, was assigned as the public affairs officer for the Department in August 1980. (Eckholm July 18 Tr. at 80.) He stated that he had a good working relationship with Chief Richardson and that he had no reason to doubt his truthfulness. (*Id.* at 85.) Among his other duties as public affairs officer, Eckholm was responsible for setting up Fire Department promotions ceremonies. (*Id.* at 80–81.) Chief Eckholm discussed with Chief Richardson the upcoming recommendations that Richardson was going to make for promotions to Deputy Fire Chief. (*Id.* at 82.) Eckholm testified that Richardson said he was going to follow the seniority list and that he specifically said he was going to promote Dougherty. (*Id.* at 82–83.) A few days before the promotions ceremony, Chief Eckholm received a list of those who were to be promoted but Chief Dougherty's name was not on the list. (*Id.* at 84.) Chief Eckholm noticed that Chief Dougherty was depressed and told him that he couldn't blame Richardson for his non-promotion since Richardson had recommended him. (*Id.*)

52. City Administrator Elijah Rogers testified that since he had held that position Chief Dougherty had never been recommended for promotion by the two Fire Chiefs and/or the Acting Chief. (Rogers, July 20 Tr. at 16.) Defendants introduced their Exhibit No. 4, dated May 23, 1980, which listed those persons selected to act as Deputy Fire Chiefs. The list contained handwritten asterisks allegedly made by Richardson to indicate which individuals would be recommended for promotion to Deputy Fire Chief. (*Id.* at 17; Def. Ex. 4.) Rogers testified on direct that the handwritten note at the bottom of the list, "*Rec. for promotion to Deputy Chief," had been written by Norman Richardson. (*Id.* at 17.) At the meeting held to discuss the August promotions, Rogers stated that Richardson had not recommended Dougherty. (*Id.* at 22.) On cross examination Rogers was impeached by a prior inconsist-

ent statement made under oath at his pre-trial deposition. At that deposition Rogers testified that he could not recognize the handwriting on the May 23, 1980 list as that of Chief Richardson. (*Id.* at 24–25.)

53. Rogers also testified that he had delegated to a special assistant the responsibility of responding to all appeals from the Office of Human Rights and to those OHR complaints in which he was named as a defendant. (*Id.* at 8.) He stated that he did not discuss Dougherty's OHR complaint (*Id.* at 12–13) nor order that office to handle his complaint in any particular fashion. (*Id.* at 13–14.) Rogers testified that he had been named as a defendant in not more than three OHR complaints. (*Id.* at 14.) On cross examination plaintiff introduced a letter dated June 23, 1980 from Rogers to Richardson which reflects Rogers' knowledge that OHR was then conducting an investigation of Dougherty's complaint. (*Id.* at 26; Pl. Ex. 16.) Also introduced was a letter of September 2, 1980 from Rogers in response to a July 28, 1980 letter from OHR (*id.* at 27; Pl. Ex. 26) as well as the July 28, 1980 letter which Rogers admitted receiving. (*Id.* at 28; Pl. Ex. 21.) Rogers did not have any discussions about Dougherty's performance with former Fire Chiefs Jefferson Lewis or Burton Johnson. (*Id.* at 29–31.)

## PLAINTIFF'S PERFORMANCE IN THE FIRE DEPARTMENT

54. Andrew Buckler testified that in his opinion, Edward Dougherty's companies "were always in the proper place and were doing what they were expected to be doing." (Buckler, July 18 Tr. at 93.)

55. Harry Gates, who served in the Fire Department for twenty-nine years and retired as a Deputy Fire Chief, testified that he had viewed Dougherty's work through the ranks from private to Deputy Fire Chief. (Gates, July 20 Tr. at 51–54.) In Gates' opinion, Dougherty made an excellent appearance and presented himself well. Gates stated that Dougherty's work as a Deputy Fire Chief was outstanding, that he was one of the better Acting Depu-

ty Fire Chiefs they had and that he was an extremely capable manager. (*Id.* at 54–48.) Gates observed Dougherty as Acting Deputy Fire Chief from 1976 to October 1, 1979 but never completed a formal evaluation of plaintiff. (*Id.* at 57–60.) On cross examination, Mr. Gates admitted that he had criticized three former Fire Chiefs to persons outside of the Department. Carmel S. DelBalzo, who retired as a Deputy Fire Chief in August, 1980 was impressed with Dougherty's performance as a captain. (DelBalzo, July 20 Tr. at 75.) Before his retirement as Fire Marshal, Chief DelBalzo recommended that plaintiff be selected as DelBalzo's replacement. (*Id.* at 77–78.)

## OTHER INCIDENTS OF RETALIATION IN THE DISTRICT OF COLUMBIA GOVERNMENT

56. William Phillips, who had been employed with the Fire Department for 29 years and who retired as a Battalion Fire Chief on August 31, 1980, testified on plaintiff's behalf. (Phillips, July 19 Tr. at 8.) Phillips testified that he attended the May 5, 1980 firefighters' rally in front of the District Building as well as the meeting of Fire Department officers called by the Mayor several days later. He testified that at that meeting Elijah Rogers accused him of "having been the troublemaker, the cause of all the dissention and the problems of the Fire Department." (*Id.* at 15.) On May 28, 1980, Phillips submitted his request for optional retirement. (*Id.* at 16.) Phillips testified that the next day, before his request had reached the Mayor, Chief Richardson told him that the Mayor had offered to effect Phillips' retirement, waive the 60-day required notice period and expedite the paperwork. (*Id.* at 17, 32–33.) Shortly after this incident but while Phillips was still employed by the Fire Department he accepted an invitation by WRC Radio to participate in a video telephone talk show where he discussed the problems the Fire Department was having and what he believed to be the causes. (*Id.* at 23.) When Phillips returned to work he was placed on administrative leave and an official order, although not from Chief Richardson, was entered that he report to the Property Section to perform an inventory. (*Id.* at 23–29.) While Phillips was assigned to the Property Section, his peers in the Fire Department were afraid to contact him; they avoided him because they were intimidated and feared harassment. (*Id.* at 24–25, 28–29, 36–37, 38.) Phillips sought legal representation after being assigned to the Property Section and his counsel informed Counsel for the District of Columbia that on July 15, 1980, Phillips would file a suit. The District of Columbia reached a settlement with Phillips on July 15, 1980. The terms of the settlement required that Phillips be reinstated to his position, that all harassment against him end and that an order in the Fire Department Manual stating that "Members shall refrain from general criticism of the Fire Department or the District of Columbia Government" be deleted. (*Id.* at 29–30, 40.) The Court finds credible the testimony of Battalion Chief Phillips. He testified that he had had a very friendly relationship with Fire Chief Richardson during the time of these events, as he had during his twenty years in the Department. He testified that he and Chief Richardson respected each other and that he admired Richardson. (*Id.* at 43.) The witness testified that although he had filed other lawsuits in the District Court which arose from incidents at the Fire Department this did not affect his testimony in this suit. (*Id.*)

57. Kenneth M. Cox, Sr., who was in his eighteenth year with the Fire Department, testified on behalf of the plaintiff. (Cox, July 19 Tr. at 46–47.) Cox explained that after fighting a fire on October 16, 1975, he complained to a WMAL Radio reporter that there had been too few fire trucks responding to the fire as a result of District of Columbia budget cuts. (*Id.* at 47–49.) Cox was ordered to and did prepare a report for the Fire Chief relaying the statements he made to the reporter. (*Id.* at 49.) He was subsequently advised that the report was going to be investigated and disciplinary charges brought against him for violating Article III, Section 15, of the Fire Department Rules and Regulations. That provision prohibited any member of the Fire

Department from talking to any member of the news media without prior permission from the Fire Chief. (*Id.* at 48–50.) Cox and a Department of Corrections employee, Phillip Matthews, who had been suspended without pay for criticizing his employer, sued the District of Columbia. (*Id.* at 49–50.) In that suit, they successfully challenged the constitutionality of Chapter 10(b)(2) of the District of Columbia Personnel Manual, a D.C. government-wide regulation prohibiting employees from making public any disagreement with, or criticism of, the official policies and operating practices of the D.C. Government. They also challenged Article III, Section 15, of the Fire Department Order Book, which prohibited employees from making public any information about departmental affairs. (*Id.* at 50–51); *Matthews v. Washington*, 424 F.Supp. 97 (D.D.C.1976).

As a result of that litigation, then D.C. Fire Chief Burton Johnson issued a directive on September 13, 1976 expunging Article III, Section 15, from the Fire Department's Order Book. *Matthews v. Washington*, 424 F.Supp. 97, 99 (D.D.C. 1976).

58. Plaintiff submitted that the reassignment of plaintiff's case from Linda Hemby, who was prepared to find probable cause, to another employee was another act of retaliation. The Court cannot so find. Ms. Hemby believed that the reassignment was taken in retaliation against her. *See* Finding of Fact, ¶ 45. While the record reflects that in August, 1980 there were communications between the Fire Department and OHR and that plaintiff did indeed retire at the end of that month, the Court would have to speculate as to whether these events standing alone triggered the reassignment from Ms. Hemby. In contrast, where the Court does have before it the very distinct instances of retaliation taken against Fire Department employees Phillips and Cox, there is no such need for speculation. However, the removal of Linda Hemby from the Dougherty case and its reassignment clearly can be considered as relevant evidence along with other evidence of continued upper level interference with plaintiff's legitimate exercise of his rights.

## THE EFFECT OF NON–PROMOTION ON PLAINTIFF

59. Shortly after plaintiff retired he sent a letter to Fire Chief Norman Richardson notifying him that because he believed he had been retaliated against and feared harassment he had decided to retire and, he and the ACLU had contemplated legal action. He did not receive a response to this letter. (Dougherty, July 18 Tr. at 52.) Plaintiff stated that not being promoted in August, 1980 had a tremendous effect upon him. He explained that he knew he was both Senior Battalion Fire Chief and Acting Deputy Fire Chief. He knew that Chief Richardson had no complaints about his work and had told him he was satisfied with his performance. Plaintiff testified that he had intended to stay in the Fire Department for thirty years. (*Id.* at 54.) Because of the District's conduct, he felt that there was no alternative but to retire because the Fire Department had been his whole life, and "everything he had pointed for was gone." (*Id.* at 54.) In plaintiff's view, his career was ended and he might as well get out. (*Id.*) He explained that:

it took me quite a long time to adjust to it, that my career was ended because I had really intended to stay there thirty years, and my career was ended then and I would not receive a promotion, that I had so much depended on, and it took awhile to get—to adjust in family life to … it. (*Id.*)

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over plaintiff's Section 1983 claims pursuant to 28 U.S.C. § 1331 and 1332 (1976) and 28 U.S.C. § 1343 (Supp. III 1979). The Court exercises jurisdiction over plaintiff's claims under the District of Columbia Human Rights Act pursuant to 28 U.S.C. § 1332 and the doctrine of pendent jurisdiction.

## I. RETALIATION

■ 2. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), sets forth the allocation and burden of proof required of the parties where a public employee claims that defendant retaliated against him for exercising his First Amendment rights. In order to prove a *prima facie* case, plaintiff must demonstrate: 1) that his conduct was constitutionally protected; and 2) that this conduct was a substantial or motivating factor in defendant's adverse decision against plaintiff. *Id.* at 287, 97 S.Ct. at 576. Once plaintiff satisfies this burden, the defendant must show by a preponderance of the evidence that it would have reached the same decision in the absence of the protected conduct. *Id.*

■ 3. Regarding the first *Mt. Healthy* factor, defendant concedes and the Court finds that plaintiff's filing of an OHR complaint is constitutionally protected speech. Defendants contend however that plaintiff's participation in the May, 1980 firefighters' rally in front of the District Building falls within a "grey area of protected speech" because personal insulting comments were made during the rally. (Post Trial Brief of Defendants at 4.)

■ 4. The Supreme Court has held that speech by employees cannot be unreasonably restricted by the State. *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Nevertheless the Court has recognized that a balance must be achieved between the interest of the employee in "commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734. Since the public school teacher in *Pickering* had criticized the School Board's method of soliciting additional tax revenues for the schools and of allocating school funds, that criticism was found to be a matter of public concern. In addition, since the criticism in *Pickering* was not directed toward any particular individual with whom the plaintiff

had to maintain a close, continuous working relationship, it did not threaten the efficiency of the school system. *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. More recently in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court recognized that "statements concerning a school district's alleged racially discriminatory policies involved a matter of public concern." *Id.*, 461 U.S. at 146, 103 S.Ct. at 1689.

■ 5. The Court finds that plaintiff's participation in the rally was speech entitled to First Amendment protection. The record clearly demonstrates that the rally participants were protesting the budgetary and promotional policies of Mayor Barry's administration as they affected the Fire Department. The comments about fiscal funding are clearly the type held by the Supreme Court in *Pickering* to be of public concern; similarly, criticism of racial discrimination is protected under *Connick.* One witness testified that during the rally some personal insults were made. The Court has found that these were not the main thrust of the rally nor the primary focus of the meeting called by the Administration several days after the rally. There was no evidence adduced by defendant pursuant to *Pickering* that the interest of efficiency in the Fire Department was jeopardized by the rally (*see* Finding of Fact ¶ 26, *infra*). *See Tygrett v. Barry*, 627 F.2d 1279, 1284–85 (D.C.Cir.1980). Nor was there evidence that plaintiff received any criticism of his work or that the plaintiff's discrimination complaints adversely affected his relationships with his superiors or subordinates.

■ 6. In *Morris v. Washington Metropolitan Area Transit Authority*, 702 F.2d 1037 (D.C.Cir.1984), the District of Columbia Circuit held that to meet his burden of proof a plaintiff must demonstrate that his protected speech was a motivating, substantial or "but for" factor in a defendant employer's decision to take an adverse personnel action against him. Defendant asserts that plaintiff fails to meet his bur-

den. Defendant states that it is reasonable to conclude that the reason plaintiff was not selected was because he had never initially been recommended by the Fire Chief; thus there was never an opportunity for the City Administrator to consider the factors of plaintiff's OHR complaint and his participation in the rally. In addition defendant suggests that it is inferable from plaintiff's non-selection that the selecting official had doubts about plaintiff's competence to hold a higher managerial position (Defendants' Post Trial Brief at 7.) The Court finds that no such inference is plausible.

7. The Court has before it evidence that plaintiff performed his job well, that he was a good and responsible supervisor and that he was regularly called upon to exercise supervisory duties as an Acting Deputy Fire Chief from 1979 to 1980. There was no contrary evidence adduced of negative elements of plaintiff's performance. While plaintiff had been eligible for promotion from the Battalion Fire Chief position since 1972, there was evidence that most firefighters from that rank spent additional time as Acting Deputy Fire Chiefs so they could be evaluated. In 1979 plaintiff was the senior officer on both the Battalion Fire Chief and Acting Deputy Fire Chief rosters. There was evidence that plaintiff had been passed over on three occasions before he filed his OHR complaint in 1979 and participated in the 1980 rally but there was no evidence that defendant Rogers knew about these instances or considered them when making promotions in August 1980. The record clearly reflects that while it was not unusual for Battalion Fire Chiefs to be "passed over" for promotion to Deputy Fire Chief on one or two occasions, those same Battalion Fire Chiefs were eventually promoted. Despite his good record, plaintiff was never promoted. Finally in August 1980, plaintiff was passed over by those men occupying the second, third, fourth and fifth Battalion Fire Chief seniority positions below him. The fact that three of those promoted had been named as plaintiffs in Mr. Dougherty's complaint does not demonstrate that the complaint was not a substantial factor in the decision not to promote Dougherty since it is uncontradicted that it was Dougherty who actively pursued that complaint. In light of this evidence it appears unlikely to the Court that plaintiff was not promoted because of problems with his job performance, as defendants have suggested. Furthermore this evidence tends to support the testimony that Mr. Dougherty had indeed been recommended for promotion in August, 1980.

8. There was a conflict in the evidence concerning whether plaintiff was recommended by Chief Richardson to Elijah Rogers when promotions in August 1980 were discussed. Chief Eckholm testified that Chief Richardson told him he expected to follow the seniority list in making recommendations for promotion to Mr. Rogers. Plaintiff testified that Chief Richardson told him he had twice recommended plaintiff for promotion, that he had not been selected because of his discrimination complaints, and that it wouldn't help if plaintiff dropped his discrimination complaints because "them seem very strong in their resolve not to promote you." *See* Finding of Fact, ¶ 49. It is uncontradicted that Chief Richardson recommended Dougherty to City Administrator Rogers.[3] Richardson stated that Rogers said he didn't think Dougherty should be promoted. Rogers testified that Dougherty had not been recommended for promotion by the two prior Fire Chiefs or by the Acting Fire Chief. Defendants introduced their Exhibit 4, about which Rogers testified that the asterisks by the names of Chiefs Burks, Granados and Shaffer and the note " * Rec. for

---

**3.** During trial there was discussion as to whether or not defendants' counsel could impeach Norman Richardson with a prior deposition statement, which was made when present defense counsel represented him. Whether or not defense counsel could have done so, he did not.

Richardson's statement was not presented to the Court and the Court cannot consider deposition testimony not introduced at trial. *See Tavoulareas v. The Washington Post Co.,* 724 F.2d 1010 (D.C.Cir.1984).

promotion to Deputy Chief" were written by Norman Richardson. The Court is not persuaded by this document because Rogers was impeached by his deposition in which he could not identify that writing; additionally there was no evidence submitted that the asterisks and note were written before the Richardson-Rogers meeting. The Court concludes from a review of all the evidence that plaintiff was in fact recommended for promotion to Elijah Rogers in August, 1980.

■ 9. Under *Mt. Healthy*, the burden was on defendants to demonstrate that they would have reached the same decision in the absence of the protected conduct. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. Defendants took the position in this litigation that plaintiff could not succeed in establishing a *prima facie* case. There is minimal evidence proffered that defendants would have reached the same decision not to promote in the absence of the constitutionally protected conduct. Defendants seemed to rely on the fact that plaintiff had been earlier passed over for promotion. As the Court explained earlier, this evidence is not persuasive. Furthermore, the Court has some doubt as to whether this argument is merely a *post hoc* justification. *See Tygrett v. Barry*, 627 F.2d at 1286. In the cases reviewed by the Court, a defendant has satisfied his burden of proof at this stage by proffering evidence of plaintiff's poor job performance, lack of qualifications for the job or some other demonstrable criteria. *See Bickel v. Burkhart*, 632 F.2d 1251, 1258 (5th Cir.1980); *Tanner v. McCall*, 625 F.2d 1183, 1195 (5th Cir.1980), *cert. denied*, 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). Such reasons exonerate the defendants from any inference that the non-promotion resulted from plaintiff's exercise of the protected conduct. There was no such evidence produced here and defendants have failed to meet their burden on rebuttal. *See McKinley v. City of Eloy*, 705 F.2d 1110, 1115 (9th Cir.1983). Thus there was no need for the plaintiff to show that defendants' asserted reason was pretextual. *Morris v. WMATA*, 702 F.2d at 1045.

## II. LIABILITY FOR RETALIATION UNDER SECTION 1983

42 U.S.C. § 1983 (1979) provides in relevant part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

### DISTRICT OF COLUMBIA

■ 10. In *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held a city may not be held liable under a *respondeat superior* theory for the acts of its employees; rather, in order to impose liability upon a municipality, a Section 1983 plaintiff must show that the unlawful decision was part of a governmental "custom or policy." *Accord, Morris v. WMATA*, 702 F.2d at 1045. Furthermore, that official policy must be "the moving force of the constitutional violation." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. *Monell* explained three alternative methods whereby a plaintiff could demonstrate that unconstitutional acts of a municipality constituted a custom or policy. First, the plaintiff could show that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted by that body's officers." *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035–36. Plaintiff contends that the Fire Department order, derived from the District of Columbia Personnel Manual, which generally prohibited Fire

Department employees from criticizing the Department was implemented when plaintiff was not promoted to Deputy Fire Chief in May, 1980. There is some uncertainty in the record as to the viability of that regulation when plaintiff was denied promotion in 1980. Apparently the regulation had been declared unconstitutional in *Matthews v. Washington*, 424 F.Supp. 97 (D.D.C.1976) (Testimony of Kenneth Cox, p. 51). During proceedings in that case, then D.C. Fire Chief Burton Johnson issued a directive on September 13, 1976 expunging the order from the Fire Department's Order Book. *Id.* at 99. Battalion Fire Chief Phillips explained, however, that the order remained in the manual in 1979 and 1980. He explained that it had only finally been removed as a result of the pre-complaint settlement of a suit he had contemplated bringing on July 15, 1980 to vindicate certain alleged retaliatory acts and harassment by the Fire Department against him. Because there is conflicting evidence concerning whether the regulation was "officially adopted by the officers" during the relevant time period, the Court finds that liability may not be imposed on the District under this *Monell* alternative.

11. However, a municipality need not act pursuant to a written regulation for it to be liable under Section 1983. A municipality may be liable under Section 1983 for constitutional deprivations "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36. In *Morris v. WMATA*, the District of Columbia Circuit explained that past acts of an employer have a bearing both on whether there exists a "custom or policy" of unconstitutional acts sufficient to impose Section 1983 liability upon a municipality as well as whether an improper motive was a "but for" cause of the discharge. *Morris v. WMATA*, 702 F.2d at 1045. Thus whether or not the retaliation by the Fire Department against Phillips, Cox and Dougherty was exercised pursuant to a regulation, the fact that adverse personnel actions were taken against these individuals after they exercised their First Amendment rights is probative of the fact that a custom or policy of retaliation existed.

12. The Court finds that there is sufficient evidence in the record to hold that criticism of the budget, personnel, or racial problems within the Fire Department by Fire Department officials was met with disciplinary action or threatened disciplinary action by the District. Such retaliatory action was not an isolated occurrence, but instead constituted an informal custom or policy of the District of Columbia. Thus, in light of the evidence of past acts of retaliation and based on the Court's finding that the exercise of plaintiff's First Amendment rights was the "but for" cause of his non-promotion, the Court concludes that the District of Columbia is liable to plaintiff under Section 1983 for retaliating against him for exercising his First Amendment rights.

13. *Monell* also establishes that a municipality may be liable under Section 1983 when "those individuals whose edicts or acts may fairly be said to represent official policy" inflict the injury for which the plaintiff is seeking relief. *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. Courts have identified these individuals by their discretionary ability to make final decisions concerning the hiring and firing of city employees. *See Berdin v. Duggan*, 701 F.2d 909, 914 (11th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983); *Williams v. City of Valdosta*, 689 F.2d 964, 969 (11th Cir.1982).

14. In this case it is clear that Mayor Barry had delegated to Elijah Rogers, the City Administrator, the task of promoting officers to the higher ranks in the Fire Department. There is no evidence that the promotion decisions were ever reviewed by Mayor Barry. Elijah Rogers' selection of those firefighters to fill the ranks of Battalion Fire Chief and above represents the official policy of the District of Columbia. The District is thus liable for the constitutional violations visited pursu-

ant to the acts of this individual whose actions represent official policy.

## INDIVIDUAL DEFENDANTS
## MAYOR BARRY

15. In *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court refused to find the individual defendants Mayor and Police Commissioner of Philadelphia liable under Section 1983 for an alleged pattern of unconstitutional treatment of minority individuals. The Supreme Court found lacking an "affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners." 423 U.S. at 372, 96 S.Ct. at 604. In this case Mayor Barry delegated to Mr. Rogers the responsibility of selecting those individuals to serve in the Fire Department at the rank of Battalion Fire Chief and above. While the Mayor was present and spoke to plaintiff at the meeting called after the firefighters' May 1980 rally, there was no evidence proffered that he was involved in the decision not to promote plaintiff which came three months after this meeting. The Court cannot speculate concerning the Mayor's involvement; it thus declines to find him liable under Section 1983 for the non-promotion of plaintiff which was based on plaintiff's exercise of his First Amendment rights.

16. Plaintiff suggests after trial that Mayor Barry may be held liable under Section 1983 for his failure to supervise Elijah Rogers. In *Bowen v. Watkins*, 669 F.2d 979 (5th Cir.1982), the Fifth Circuit explained,

> Usually, a failure to supervise gives rise to Section 1983 liability only in those situations in which there is a history of widespread abuse. Then knowledge may be imputed to the supervisory official, and he can be found to have caused the later violation by his failure to prevent it.

*Id.* at 988 (citations omitted). Although there was some history of unlawful retaliation, there was no such history of "widespread abuse" by the City Administrator presented at trial. The Court therefore cannot charge Mayor Barry with such knowledge. Further, the Court is reluctant to find that Mayor Barry was put on notice of any wrongdoing of his City Administrator by virtue of the fact that Elijah Rogers had no more than three discrimination complaints filed against him while he was City Administrator. Mayor Barry is therefore not individually liable to plaintiff.

## ELIJAH ROGERS

17. The Court must first decide whether Elijah Rogers is entitled to claim the defense of qualified immunity for his acts as City Administrator. In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that

> government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738.

The Court thus established the qualified immunity privilege and further explained that while the case did not involve a § 1983 suit against state officials, "it would be untenable to draw a distinction" between such suits and suits brought under the Constitution against federal officials. *Id.* at 818 n. 30, 102 S.Ct. at 2739 n. 30.

A court is thus required to determine the status of the law at the time the alleged prohibited acts were taken. *Hobson v. Wilson*, 737 F.2d 1, 24 (D.C.Cir.1984); *Zweibon v. Mitchell*, 720 F.2d 162, 168 (D.C.Cir.1983), *cert. denied,* — U.S. —, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984).

18. At the time of plaintiff's non-promotion in August, 1980, as today, the statute governing the appointments to the rank of Deputy Fire Chief vested unlimited discretion in the Mayor or his delegate. Yet in 1980, as today, the Supreme Court had pronounced that a public employer has a legitimate interest in promoting the efficiency of the public services it performs through its employees. *Pickering*, 391

U.S. at 568, 88 S.Ct. at 1734. This factor is one to be balanced when a public employee wants to publicly comment about his employer on matters of public concern.

 19. The Court concludes that Elijah Rogers' actions in not promoting plaintiff were taken pursuant to a District of Columbia statute granting the Mayor, or his delegate, broad discretion in promoting to the position of Deputy Fire Chief. Furthermore, the Supreme Court had, by August 1980, long held that it was permissible to weigh the interest of a public employee in voicing criticism on matters of public concern against the interest of promoting the efficiency of providing services. The concern of maintaining harmonious Fire Department forces was voiced by both Mayor Barry and Elijah Rogers at the May 1980 meeting following the rally and by Elijah Rogers at trial. Insofar as Rogers' decision not to promote plaintiff was motivated by these concerns which surfaced after plaintiff's participation in the rally, the Court concludes he may claim the qualified immunity privilege.

20. At least since the enactment of Title VII, an employer has been prohibited from taking any adverse action against an employee who files a discrimination complaint. Clearly this is law of which a reasonable person would have known. Norman Richardson testified that Elijah Rogers resisted Richardson's recommendation of Dougherty for promotion. Plaintiff testified that Richardson told him he had not been promoted because of his discrimination complaint. There was evidence that Rogers knew of the complaint during the time of the July-August, 1980 period of promotion discussions. Inasmuch as Rogers' decision not to promote plaintiff was based on plaintiff's filing and prosecution of his OHR complaint, Rogers cannot be shielded by the qualified immunity privilege.

### LIABILITY UNDER THE D.C. HUMAN RIGHTS ACT

21. The District of Columbia Human Rights Act provides that it is unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, including promotion" on the grounds of "race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, or political affiliation...." D.C.Code § 1–2512 (1981). The Act also provides that an aggrieved individual may bring a private cause of action "in any court of competent jurisdiction for damages and such other remedies as may be appropriate." D.C.Code § 1–2556.

 22. The District of Columbia Court of Appeals has held that "the private right of action established by D.C.Code § 1–2556 (1981) and its predecessor ... is available only to non-government employees." *Williams v. District of Columbia*, 467 A.2d 140, 142 (D.C.1983). Thus, as a District employee, Dougherty may not maintain an action for damages under the Human Rights Act and that portion of his claim must be dismissed.

### DAMAGES AND INJUNCTIVE RELIEF

 23. The basic purpose of a § 1983 damage award is to provide compensation for injuries resulting from constitutional violations. In considering the appropriate measure of relief, the Court must take care to insure that the award is compensatory; substantial damages may be awarded only for actual injury. *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Compensatory damages may include amounts for mental and emotional distress. *Id.* at 265, 98 S.Ct. at 1053. *See also Harris v. Harvey*, 605 F.2d 330 (7th Cir.1979), *cert. denied*, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980). Punitive damages are also available where the defendant's conduct is motivated by ill will or when the conduct demonstrates a reckless or callous attitude towards federally protected rights. *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Clark v. Beville*, 730 F.2d 739 (11th Cir.1984).

24. In this case, the plaintiff undoubtedly suffered some embarrassment and indignation, as well as other emotional injury, due to the unlawful acts of the defendants. *See* 21 D.C.Reg. 1615 (1975) (automatic award of damages under D.C. Human Rights Act because "[t]he natural and unavoidable consequences of any unlawful discriminatory acts or practices are personal embarrassment, humiliation and indignity"). Plaintiff testified to a loss of self-esteem and difficulty in adjusting to retirement. Yet, the emotional distress suffered by plaintiff is not easily quantifiable. Beyond plaintiff's brief statements as to his condition, the Court would have to speculate as to the extent of injury suffered by plaintiff. In the absence of sufficient proof of mental or emotional injury, the Court cannot speculate, *Carey*, 435 U.S. at 264–65, 98 S.Ct. at 1052–53.

25. With respect to tangible (non-emotional or mental) damages, there is ample evidence of injury and causation of that injury by the defendants' unlawful conduct. Accordingly, based on evidence of injury to plaintiff's career arising from the violation of his First Amendment rights, the Court orders defendants Rogers and the District of Columbia to: 1) retroactively promote plaintiff to Deputy Fire Chief effective October 5, 1980; 2) pay plaintiff the salary he would have received as a Deputy Fire Chief from October 5, 1980 to March 31, 1983, less the pension benefits plaintiff actually received during that period; 3) pay plaintiff the difference between the pension benefits plaintiff is entitled to receive as a Deputy Fire Chief and the pension benefits he actually received from April 1, 1983 to the date of this judgment. An appropriate Order will issue in accordance with the terms of this Opinion.