Edward F. DOUGHERTY, et al., Plaintiffs,

v.

Marion BARRY, Jr., et al., Defendants.

Edward F. DOUGHERTY, et al., Plaintiffs,

v.

Marion S. BARRY, Jr., et al., Defendants.

Civ. A. Nos. 82–1687, 83–0314.

United States District Court, District of Columbia.

April 30, 1985.

Marianne Shannon, Robert W. King, Greenbelt, Md., James Brewster Hopewell, Gaegler & Hopewell, Landover, Md., for plaintiffs.

George C. Valentine, Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

These related actions arise from the June, 1979 and January, 1980 promotions of Norman Richardson, Joseph Kitt and Theodore Coleman, all of whom are black, to deputy fire chief positions within the District of Columbia Fire Department. Plaintiffs, all of whom are white, allege that they were eligible for those promotions and contend that they were not chosen for the positions because of their race.

Plaintiffs Edward F. Dougherty, Andrew T. Buckler, Jr., Wilton E. Watts, Henry J. Ford, and Francis X. Flaherty bring the earlier case, Civil Action No. 82–1687, against defendants District of Columbia, Mayor Marion Barry, Jr., and City Administrator Elijah B. Rogers (in their individual and representative capacities) challenging the Richardson, Kitt and Coleman promotion decisions made by defendants as violative of plaintiffs' rights under the Civil Rights Act of 1866, 42 U.S.C. § 1981 (hereinafter "section 1981") and the Fifth Amendment to the United States Constitution.[1] Joined by plaintiffs Bernard M. Bowerman, Vincent K. Elmore and William H. Phillips, the same plaintiffs allege in Civil Action No. 83–0314 that the same promotion decisions were racially discriminatory in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.* (hereinafter "Title VII"). Defendants to the Title VII action are Mayor Marion Barry, Jr., and City Administrator Elijah B. Rogers (in their official capacities only), the Government of the District of Columbia Fire Department and the District of Columbia.

On July 24, 1979, plaintiff Dougherty filed with the District of Columbia Office of Human Rights ("OHR") a charge of race discrimination with respect to the Richardson promotion. The remaining plaintiffs joined that charge days later, and it was referred by OHR to the Equal Employment

---

1. Wendell L. Shingler was at one time a co-plaintiff to this action. He withdrew his claims on September 7, 1983.

Opportunity Commission ("EEOC") for simultaneous processing. On March 27, 1980, the charge was amended to encompass the Kitt and Coleman promotions as well. Details of the problem-fraught administrative processing of plaintiffs' OHR/EEOC complaint are recited in the Order of March 6, 1984 (Civil Action No. 83–0314) and need not be repeated here. In essence, that Order held that plaintiffs' Title VII claim, filed February 4, 1983, was timely brought in response to a notice of right to sue. These civil actions, although not consolidated, were tried together in a four-day trial.

### I. *Factual Background*
#### A. *Structure and Policies of the Fire Department*

Discussion of the merits of plaintiffs' claims requires some background knowledge of the setting in which they arose. The District of Columbia Fire Department is hierarchical in structure. The fire chief holds the top position in the hierarchy; directly beneath him are two assistant fire chiefs heading the operations and the services sectors of the department. The bulk of the department's manpower is in the operations sector, which at all times relevant to these actions included no more than six deputy fire chiefs ranked one level below the assistants and between 30 and 40 battalion fire chiefs who report to the deputies. Some but not all of the deputies within the operations sector are responsible for firefighting operations, one runs the department's training academy and one serves as fire marshal in charge of fire prevention efforts. Most of the battalion chiefs in operations are involved in firefighting, although one serves under the deputy heading the training academy and others may have comparably specialized duties. One battalion chief is assigned planning and research duties and works directly under the assistant chief in the services sector.

Promotions through the lower ranks of private, sergeant, lieutenant and captain, up to battalion chief, are based on test scores and years in rank or grade. Under D.C.Code § 4–302 (1981), promotions above battalion fire chief are made at the discretion of the mayor upon the recommendation of the fire chief. Moreover, no fire department policy, rule or regulation mandates rank by rank advancement above the level of battalion chief: the only prerequisite to promotion to deputy, assistant or even fire chief is that the officer must have attained the rank of battalion fire chief.

During the years relevant to this case, the District of Columbia Fire Department had no formalized system for filling vacancies at the level of deputy fire chief. It was, however, well known among the battalion chiefs that the office of the fire chief (which included the chief and both of his assistants) maintained a list or lists of those battalion fire chiefs who had been designated acting deputy fire chiefs ("acting DFCs"),[2] arranged alphabetically or by date of promotion to battalion chief or both. There is no reliable evidence that any list was captioned a seniority list or that a strict seniority system was employed in the filling of vacancies at any level above battalion chief. Instead, it appears that the common practice was to select deputies from among the more senior battalion chiefs with acting deputy status, but to take account of the specialized needs of the position to be filled. Neither regulation nor custom dictated that the most senior or senior-in-grade acting DFC receive preferential consideration, but in general the five or six more senior members of that group were those most likely to be tapped for promotion.

In both fiscal year 1979 (10/1/78–9/30/79) and fiscal year 1980 (10/1/79–9/30/80), the District of Columbia Fire Department had in effect equal employment opportunity plans, in keeping with D.C.

---

**2.** An acting DFC retains the rank of battalion chief, but may be called upon to temporarily assume the duties of an absent deputy chief.

During the 1970's, the number of acting DFCs at any given time fluctuated between ten and twenty, approximately.

Code §§ 1–507 *et seq.*[3] See DX–K, DX–L. Despite introductory language calling for "programs of definite affirmative action", the plans do not on their face call for preferential treatment of minorities over whites in filling vacancies or designate specific positions or numbers of positions to be set aside for minority hires or promotions. The focus of the FY–1979 and FY–1980 plans is on the goal of "equal opportunity in all facets of [the department's] operations, including but not limited to recruiting, assignment, selection, appointment, training, promotion and upward mobility", and the need for officers to develop and exercise "an increased awareness of the personal potential of employees within their operational responsibility, as well as the barriers that may consciously or unconsciously impede their progress," DX–L at 2. The stated objectives of both plans include improving the processing of discrimination complaints, upgrading minority recruitment, and encouraging upward career mobility by providing on-the-job training, devising career development plans for minority employees, and disseminating information about advancement opportunities to underrepresented groups. The general language and policies of both plans, although particularly geared to assist the rank and file of the department, could apply equally to all levels of the departmental hierarchy.

In the area of promotion, the FY–1979 plan states that "the department endeavors to promote present [minority] employees to higher-graded positions, where possible, rather than hire new employees from the outside to fill vacant positions." DX–L at 19. The FY–1980 plan takes the following stand:

> Minority officers should be detailed into positions of higher ranks for training and experience. This could be done when a position is vacant due to sick leave, annu-

al leave or retirement. New positions could be created where necessary or feasible, either permanent or temporary. DX–K at 15 (unnumbered pages). The plans do not set forth racial quotas and in fact make no specific provisions for implementation of their goals. Furthermore, they do not indicate that preferences are to be afforded to minorities or that non-minority department members will be denied equal consideration for promotion.

### B. *The Events of 1979 and 1980*

The related actions now before this Court arise from three promotion decisions made while the plans described above were in effect at the District of Columbia Fire Department. All three promotions at issue elevated blacks from battalion fire chief positions to the deputy fire chief level. The relevant chain of events began in the spring of 1979, when then-Fire Chief Jefferson Lewis turned his attention to the task of finding a candidate to fill an existing or impending vacancy at the position of deputy fire chief in charge of the department's training academy ("DFC–Training"). At meetings held in May, 1979, top management officials of the department offered their recommendations for appointees to that position, and upon consideration of their suggestions, Lewis, who is black, decided to recommend Alfonso Torre for the job. Torre, a white man of Italian descent, was the battalion fire chief assigned to the training academy at that time. Lewis submitted his recommendation to the office of Mayor Marion Barry and at approximately the same time he directed Torre to complete a department physical examination. From past experience with the prior mayoral administration, Lewis expected his recommendation to be approved without challenge, and his expectation was shared— among the officers, an order to appear for a physical had come to mean that promo-

---

**3.** Under D.C.Code § 1–508:

"Every District government agency shall develop and submit to the Mayor and Council an affirmative action plan. Such plan shall be submitted within 12 calendar weeks after May 6, 1976, and each year thereafter, at the time each agency's annual budget is submitted to the Council."

*See also* D.C.Code §§ 1–507 through 1–514 (definitions and specifications applicable to affirmative action plans).

tion was a virtual certainty. Unbeknownst to Lewis, the Barry administration, then in office some six months, had decided to take an active role in awarding promotions within the fire department, and Mayor Barry, who is black, had delegated his authority to do so to then-City Administrator Elijah Rogers, who is also black. Having anticipated a rubber-stamp approval of his recommendation, Lewis was surprised to be called upon by Rogers to discuss the matter in June, 1979.

At trial, Lewis' and Rogers' memories of that meeting were basically in accord. According to both parties to the conversation, Rogers chided Lewis for proceeding to order Torre to appear for a physical before Rogers had cleared the promotion. He then reminded Lewis of the Barry administration's "affirmative action goals" and inquired whether Lewis had considered those goals in making his recommendation. Rogers asked whether Lewis had considered promoting Norman Richardson, the battalion fire chief for planning and research, to the vacant post. Richardson is black. Lewis responded that he had not, at which point Rogers directed Lewis to "go back to the drawing board" and rethink his recommendation in light of the department's "affirmative action goals". According to Lewis, Rogers did not specifically state that he would approve only Richardson for promotion or that he would approve only a black officer for promotion. Nonetheless, Lewis left the conversation with the distinct impression that Richardson was the preferred candidate of the mayor's office for the DFC–Training position. After apologetically explaining to Torre that the City Administrator was blocking his promotion, Lewis ordered Richardson to appear for a physical exam. The Richardson promotion recommendation was approved without delay.

At the time of the Richardson promotion, nine battalion fire chiefs, including Torre and plaintiffs Dougherty, Phillips, Watts, and Ford, had been designated to serve as deputy fire chiefs. Richardson was not among that group. Moreover, he was not one of the more senior battalion chiefs. Many of his peers, including all of the plaintiffs, had held that rank for longer periods of time. Based on those facts and their knowledge of the circumstances surrounding the Richardson promotion, the plaintiffs joined in an administrative complaint alleging that the promotion was the product of discrimination.

In October, 1979, while administrative processing of that complaint continued, the group of battalion fire chiefs with acting DFC designation was expanded by eleven to a total of nineteen.[4] Nine of the newly inducted members of the group, including plaintiffs Bowerman, Buckler, Elmore and Flaherty, were white; two—Joseph Kitt and Theodore Coleman—were black. Kitt and Coleman had the least in-grade seniority of the eleven: they had been promoted to battalion chief in January 1977 and August 1977, respectively, whereas the nine white officers had promotion dates ranging from May 1976 to October 1976. Nonetheless, when three deputy fire chief vacancies (the first at that level since the DFC-Training opening) arose in January 1980, Kitt and Coleman were promoted to fill two of the three slots. The third promotion was awarded to Torre.

The selection process behind the Kitt and Coleman promotions bore little resemblance to the process which led to the Torre recommendation or the Richardson promotion in the summer of 1979. Jefferson Lewis retired from the position of fire chief in December, 1979 and he did not participate in the evaluation of potential candidates for promotion to deputy chief in January, 1980. Rather than looking to the acting fire chief for recommendations, Elijah Rogers personally assumed the task of locating suitable candidates. Rogers testified that his approach was not simply to caucus with top management officers (which he did to some degree) but also to

---

**4.** One of the ten ADFC's as of June, 1979 was no longer serving in that capacity at the time of the October, 1979 expansion. *See* DX–GG.

go out to the fire stations to elicit the opinions of the department's rank and file. Rogers further testified that he personally interviewed some fifteen candidates at his office; however, upon cross examination he could not clearly recall whether he had or had not interviewed any of the plaintiffs (all of whom were present in the courtroom) or any of the other white acting deputy chiefs with in-grade seniority over Kitt and Coleman in January, 1980. Rogers acknowledged that race was a factor in his search, but testified that other relevant factors included the candidate's managerial philosophy and his ability to work with people of diverse backgrounds, to supervise well, and to command maximum efficiency from the workforce. Although none of the assistant or deputy chiefs with whom Rogers discussed the matter recommended Kitt, Coleman or Torre over their peers, he decided, "upon consideration of both subjective and objective factors", to promote those three men to the deputy level. Tr. 577.

At trial, former Assistant Chief John Devine offered a different perspective on Rogers' selection process. In late 1979, Devine (who is white) held one of the two assistant fire chief positions (AAFC–Operations) and was under consideration for promotion to fire chief. In the course of his discussions with the mayor's office in that regard, the subject of minority promotions arose. According to Devine's testimony, Rogers told him in December, 1979 that he was the choice of both Mayor Barry and Rogers to be fire chief, but that certain conditions attached to his promotion. Specifically, Devine stated, Rogers indicated that if Devine were promoted to fire chief, the two open assistant chief positions and two deputy posts would necessarily be filled by blacks. Devine testified that he objected to the terms of Rogers' offer in that he saw no place in the department for

promotions based strictly on race, although he was not opposed to the department's affirmative action program. Devine voiced his objections to Rogers and the two agreed to disagree: Devine withdrew from consideration for the fire chief appointment, but he felt no pressure from Rogers to resign from the department. Nonetheless, Devine saw no possibility for his own further advancement under the Barry administration, and he retired within the year. Rogers recalled the discussion to which Devine referred and remembered exchanging ideas with Devine about at least one potential deputy chief appointment, but he denied that he or Mayor Barry attached conditions to the selection of Devine as fire chief and offered nothing to counter Devine's explanation for his decision to pass up the opportunity to become fire chief.

The promotions of Torre, Kitt and Coleman took effect on January 24, 1980, three days before the promotion of Norman Richardson to fire chief. Shortly thereafter, in February 1980, all officers were invited but not required to attend a meeting held by the fire department and city administration for the purpose of introducing the newly promoted officers. Little testimony about this meeting was taken at trial. Plaintiff Bowerman testified as to certain statements allegedly made at the February meeting; however, his statements match the testimony of his fellow plaintiffs as to a *separate* meeting, and thus Bowerman's accuracy on this subject must be doubted. In consideration of the entire record, the Court must conclude that the February, 1980 meeting was uneventful.

Throughout the spring of 1980, discontent as to the Kitt and Coleman promotions festered among the white battalion chiefs, particularly those with acting deputy status.[5] In response to that discontent, the fire department and city administrators called a second meeting of all officers in

---

**5.** Further discussion of the officers' expressions of discontent is contained in the findings of fact and conclusions of law of Judge Hogan in *Dougherty v. Barry*, 604 F.Supp. 1424 (D.D.C. 1985). That opinion discusses plaintiff Dougherty's first amendment claims arising from the

treatment accorded him by the fire department after he (1) participated in a firefighters' rally organized to voice criticism of the department in early May 1980, and (2) filed the administrative claim which gave rise to the Title VII action before this Court (Civil Action No. 83–0314).

May, 1980 with attendance mandatory. On this topic the plaintiffs' speak essentially with one voice: all agree that the purpose of the meeting, as stated to them, was to set forth in no uncertain terms the Barry administration's promotional policy. Mayor Barry stated that just as it had been in January, 1980, race would continue to be a factor in future fire department promotions, and he declared that he had a "commitment to achieve racial balance" and a "mandate" to promote blacks at all levels of the department in light of past racial discrimination in promotions within the department. Mayor Barry further stated that he was displeased by the officers' unwillingness to come to terms with his policy and admonished them to "get on the team" or retire. Upon hearing Mayor Barry's remarks, plaintiff Dougherty, who was sitting nearby, shook his head slightly. When asked by Barry to explain that gesture, Dougherty responded that he disagreed with the basis of the mayor's policy, his finding of past discrimination. At that point, Mayor Barry discontinued the conversation. After Mayor Barry left the floor, Elijah Rogers addressed the group. Among other things, he expressed his own displeasure with recent public and interdepartmental criticism of the Barry administration promotions and angrily told the officers, "If I could, I'd fire half of you." Neither Barry nor Rogers mentioned racial quotas.

This synopsis of the May, 1980 meeting reflects not only the eight plaintiffs' testimony but that of other witnesses who attended the gathering. Norman Eberhard, who was at that time the fire department administrator, could not recall at trial any mention of past discrimination, but remembered the mayor's declaration that race had been and would be a factor in promotions. Tr. 494. Elijah Rogers' memory of Barry's statements was very cloudy, but he testified that the mayor may have referred to using race as a factor. Officers Devine and Torre, neither of whom is a plaintiff,

offered versions of the story very similar to those of plaintiffs.[6]

According to all attending the May, 1980 meeting who testified at trial, the thrust of the meeting was that the use of race as a factor in fire department promotions was an immutable policy. One by one, the plaintiffs stated at trial that their reaction to the mayor's blunt message was one of shock: after their many successive promotions through the department, none of the plaintiffs could see any opportunity for his own further career advancement under the Barry administration's policies. Each of the plaintiffs resigned from the department less than four months after the critical meeting and no later than August 30, 1980.

Between the time of the Kitt, Coleman and Torre promotions and plaintiffs' retirements, there were no promotions to deputy chief awarded in the fire department. However, on October 5, 1980, only two months after the last of the plaintiffs departed, four officers were promoted from battalion chiefs to deputy chiefs. All four of those men were white, and three of the four had been designated acting DFCs. The plaintiffs testified that when they retired, they did not know that the promotions were upcoming, much less that whites would even be considered for promotion.

## II. Analysis of Claims
### A. Constitutional Claims

■ Because plaintiffs' allegations of race-based discrimination are actionable under Title VII and section 1981, plaintiffs may not challenge defendants' conduct directly under the Fifth Amendment of the Constitution. *Ethnic Employees of Library of Congress v. Boorstin,* 751 F.2d 1405, 1415 and cases cited at n. 12 (D.C.Cir. 1985); *Torre v. Barry,* 661 F.2d 1371, 1372, 1374 (D.C.Cir.1981) (fifth amendment claim based on race discrimination barred). The effect of the equal protection component implicit in the fifth amendment due process

---

**6.** To the extent that Devine attributes to Rogers statements made by Mayor Barry, his testimony

is not credible. *See* Tr. 372.

clause on defendants' affirmative action defense will be discussed *infra* at Part II.B.

## B. *Claims Under Title VII and Section 1981*

### 1. *Structure of Analysis*

 *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), provides the analytic framework for claims of race discrimination in employment, whether they are brought under Title VII or section 1981. *Carter v. Duncan-Higgins, Ltd.,* 727 F.2d 1225 (D.C.Cir.1984). Under *Burdine* and its progeny, *see United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the fundamental inquiry is whether the challenged employment decision, be it a decision to hire, to fire, to promote, or to otherwise act, is motivated by discrimination. However, before the litigation may proceed to that question, certain burdens must be met. First, the plaintiffs bear the burden of proving by a preponderance of the evidence a prima facie case of race discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. This burden is not onerous; *id.* at 253, 101 S.Ct. at 1093; *see also Ethnic Employees of the Library of Congress v. Boorstin,* 751 F.2d at 1416, and in the context of a failure to promote it generally is met by a showing (1) that plaintiffs belong to a protected group, (2) that they were qualified for and applied for a promotion, (3) that they were considered for and denied the promotion, and (4) that a similarly-qualified employee from outside the protected group was promoted at the time that plaintiffs were denied promotion. *Bundy v. Jackson,* 641 F.2d 934, 957 (D.C.Cir.1981); *see also Parker v. Baltimore & O.R.R.,* 652 F.2d 1012, 1017 (D.C.Cir.1981); *Sales v. Dep't of Justice,* 549 F.Supp. 1176, 1184 (D.D.C.1982), *aff'd* 717 F.2d 1480 (D.C.Cir. 1983). From one case to the next the model may require some fine tuning, *see generally Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6; *Bundy v. Jackson,* 641 F.2d at 945. For instance, if the employer

does not call for applications, the second prong may be satisfied by a showing that the plaintiffs were qualified for the position and "might have reasonably expected selection for promotion". *See McCormick v. District of Columbia,* 554 F.Supp. 640, 644–45 nn. 14, 15 (D.D.C.1982).

 By establishing a prima facie case, the Title VII plaintiff creates a "rebuttable presumption" of unlawful discrimination by the employer. *Aikens,* 460 U.S. at 714, 103 S.Ct. at 1481, *citing Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To rebut the presumption, the defendants must produce evidence that the plaintiffs were rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. If defendants do so, the presumption "drops from the case", *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10, and the ultimate factual issue—whether or not the defendants intentionally discriminated against the plaintiffs—is placed before the Court. *See Lanphear v. Prokop,* 703 F.2d 1311, 1314 (D.C.Cir.1983). Throughout the proceedings

> 'The plaintiff retains the burden of persuasion. [H]e may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' 450 U.S. at 256 [101 S.Ct. at 1095].

> In short, the district court must decide which party's explanation of the employer's motivation it believes.

*Aikens* 460 U.S. at 714–16, 103 S.Ct. at 1481–83; *see also Cooper v. Federal Reserve Bank of Richmond,* —— U.S. ——, ——, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984); *Ethnic Employees of the Library of Congress v. Boorstin,* 751 F.2d at 1417.

 Title VII affords protection to white plaintiffs subjected to race-based discrimination. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976); *see also Lanphear v. Prokop,* 703 F.2d 1311.

To establish the first element of the prima facie case (membership in a protected class), the white plaintiff cannot merely state his race; he must show that "background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority." *Lanphear v. Prokop,* 703 F.2d at 1315, *quoting Parker v. Baltimore & O.R.R.,* 652 F.2d at 1017. If he meets that requirement and also shows that he was qualified for the position in question but was rejected in favor of a member of a racial minority, he has met his burden of showing rejection "under circumstances which [despite the plaintiff's majority status] give rise to an inference of unlawful discrimination." *Lanphear v. Prokop,* 703 F.2d at 1315, *quoting Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *see also Turgeon v. Howard University,* 571 F.Supp. 679, 686 (D.D.C.1983).

### 2. *Promotion of Norman Richardson—June 1979*

 In this case, none of the plaintiffs has made a prima facie showing that his nonselection for the DFC-Training position in June, 1979 resulted from race-based discrimination. Even if the pro-affirmative action climate in the mayor's office at that time can be considered evidence of pressure to favor blacks over whites in promotions within the fire department, *see Lanphear v. Prokop,* 703 F.2d at 1315 (finding such pressure relevant to first prong of prima facie standard), and accepting as truth that these plaintiffs were qualified for the promotion, they have not raised the inference that they were considered and rejected by reason of their race. To the extent that these plaintiffs were considered for the position in question, each had been rejected by Chief Lewis in favor of a fellow *white* officer, Alfonso Torre, well before the Richardson promotion.

The testimony presented at trial shows that the Richardson promotion followed a two-phase selection process. In the first phase, Chief Lewis entertained the suggestions of various top management officials in the fire department and selected Alfonso Torre for promotion. None of the plaintiffs claims that the Torre recommendation was tainted in any way. By all accounts Torre was an outstanding officer and one of the more experienced among the acting deputy chiefs: only plaintiffs Dougherty, Phillips and Watts had been given acting deputy status before Torre. Not even those three could stake any claim to the 1979 vacancy, as no fire department rule or practice guaranteed promotion by order of designation to acting status or by order of seniority in the department or at the battalion chief level. All testimony taken at trial indicates that promotion decisions at the upper tiers of the department rested on a combination of factors, including the specialized nature of the vacant position. As the battalion chief assigned to the training academy Torre was uniquely situated to know the problems and needs of the training program, and none of the plaintiffs claims to have protested when he and not they received Lewis' recommendation for promotion to the DFC-Training post.

Only after the Torre recommendation was submitted by Chief Lewis for approval did the mayor's office become involved in the selection process. The discussion in which Elijah Rogers directed Chief Lewis to "rethink" his recommendation marks the beginning of the second phase of that process, a phase characterized by attention to the Barry administration's affirmative action goals. Even if Mayor Barry's and/or Rogers' policies and directions resulted in impermissible disparate treatment of *Torre* in the second phase of the selection process, these plaintiffs were no longer under consideration when the alleged disparate treatment came into play.

 It is noteworthy that even when a Title VII plaintiff *is* found to have been subjected to disparate treatment in promotion, his claim for a retroactive remedy (*i.e.* back pay or reinstatement) will be denied if he would not have been promoted even absent the discrimination. *Milton v. Weinberger,* 696 F.2d 94, 98–99 (D.C.Cir.1982); *cf. Toney v. Block,* 705 F.2d 1364, 1370

(D.C.Cir.1983) (Tamm, J., concurring). In this Circuit, the burden is on the defendant to show at the remedial stage of the litigation that the plaintiff would not have been selected for promotion in any event, if the liability inquiry results in a finding of specific disparate treatment against the plaintiff (as opposed to a finding of discrimination in the workplace at large). Defendants could easily meet that burden in these circumstances; however, plaintiffs' claims with respect to the DFC-Training promotion will not even proceed to the remedial stage, as the plaintiffs have failed to muster the prima facie case needed to move the liability inquiry forward.

### 3. Promotions of Joseph Kitt and Theodore Coleman—January, 1980

■■■■ Plaintiffs' claims arising from the Kitt and Coleman promotions in January, 1980 remain before the Court.[7] As before, a suspicion of reverse discrimination can be drawn from the expressions of strong affirmative action sentiment within the Barry administration, see Lanphear v. Prokop, 703 F.2d at 1315.[8] Moreover, defendants concede that the plaintiffs were qualified for the promotions in question. The facts which precluded a prima facie case of discrimination with respect to the DFC-Training promotion no longer obtain: no evidence indicates that the plaintiffs were eliminated at an early stage of the selection process for purely nondiscriminatory reasons. As battalion fire chiefs, plaintiffs were among the group of eligible officers who could reasonably expect at least cursory consideration for promotion, and they were passed over in favor of officers Kitt and Coleman, both of whom are black. From these facts, plaintiffs have made a prima facie showing that their nonselection for promotion was a product of racial discrimination.

### a. Effect of Race on Selection Process: Causation Inquiry

■■■ To rebut plaintiffs' prima facie case, defendants assert that the Kitt and Coleman promotions were not based on race, and even if they were, they are the products of legitimate affirmative action efforts. Setting aside for the moment defendants' alternative affirmative action defense, we turn first to the issue of whether and to what extent those responsible for the Kitt and Coleman promotions considered race in making their selections. By asserting that plaintiffs were rejected on account of factors other than race, defendants have satisfied their minimal burden of rebuttal and the case proceeds to the ultimate inquiry—whether defendants impermissibly discriminated against plaintiffs by promoting Kitt and Coleman. See Aikens, 460 U.S. at 715, 103 S.Ct. at 1482; Cooper v. Federal Reserve Bank of Richmond, —— U.S. ——, ——, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984). Under Aikens, 460 U.S. at 716, 103 S.Ct. at 1482, and Burdine, 450 U.S. at 256, 101 S.Ct. at 1095, plaintiffs bear the ultimate burden of satisfying the relevant standard of causation.

---

**7.** As to the Kitt and Coleman promotions, the Title VII claim of plaintiff Henry J. Ford cannot succeed. The evidence demonstrates that plaintiff Ford was a complainant in two separate administrative charges challenging the Kitt and Coleman promotions as racially discriminatory. The first of those was the group charge filed in July, 1979 and amended to encompass the Kitt and Coleman promotions on March 27, 1980; the second was Ford's individual EEOC charge filed on or about April 7, 1980. The scope of the latter charge was limited to the Kitt and Coleman promotions. See DX–X. While administrative processing on the group charge continued, on November 18, 1980 the EEOC dismissed Ford's individual charge for lack of jurisdiction. Ford did not timely appeal that dismissal. Having thus sacrificed his claim, Ford has no right to continue to assert the identical claim through the group charge: as to the Kitt and Coleman promotions, Ford's Title VII claim of racial discrimination was extinguished when his time for appealing the November 18, 1980 dismissal expired. However, inasmuch as section 1981 contains no exhaustion requirement, the EEOC proceedings have no bearing on Ford's section 1981 claim and it will survive.

**8.** The Court does not in any way imply that the mere adoption of affirmative action policies, without more, gives rise to a suspicion of discriminatory intent.

■ The Court of Appeals for this Circuit has candidly acknowledged that "it is uncertain what standard of causation applies [at the liability phase] in Title VII discrimination cases." *American Federation of Government Employees v. Federal Labor Relations Authority*, 716 F.2d 47 (D.C.Cir.1983). Various courts require that the plaintiff demonstrate that race was "a" factor in an employment decision, *Satz v. I.T.T. Financial Corp.*, 619 F.2d 738, 746 (8th Cir.1980); *see also Toney v. Block*, 705 F.2d at 1372 (Tamm, J., concurring); a "determinative factor", *Mack v. Cape Elizabeth School Board*, 553 F.2d 720 (1st Cir. 1977); a "significant factor", *Fadhl v. City and County of San Francisco*, 741 F.2d 1163, 1166 (9th Cir.1984); a "substantial factor" in the employer's decision, *Barnes v. Costle*, 561 F.2d 983, 990–91 (D.C.Cir. 1977); or the "but-for cause" of the employment decision, *Lewis v. University of Pittsburgh*, 725 F.2d 910 (3d Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 266, 83 L.Ed.2d 202 (1985). *See also* Brodin, The Standard of Causation in the Mixed-Motive Title VII Action: A. Social Policy Perspective, 82 Colum.L.Rev. 292 (1982). For the reasons stated in Judge Tamm's concurrence to *Toney v. Block*, 705 F.2d at 1372–73, at this stage of the litigation this Court would require "merely proof that discrimination was *a* factor in the employment decision", *id.* at 1372 (emphasis added). However, even under the more rigorous tests catalogued above, there is no doubt of a causal link between defendants' consideration of race and the promotions of Kitt and Coleman.

Both Mayor Barry (at the May, 1980 meeting) and Elijah Rogers (at trial) testified that race was "a" factor in the selection of officers Kitt and Coleman for promotion. Rogers declined to admit that race was "*the*" factor, but even without that concession the record demonstrates that under any of the above standards of causation, Officers Kitt and Coleman were promoted because of their race. The evidence to support this conclusion is both direct and indirect. On a general level, the depth of concern in the Barry administration for minority upward mobility in early 1980 raises the suspicion that race weighed heavily in the Kitt and Coleman promotions. That concern is evidenced by the mandatory passage of affirmative action plans (labeled "equal employment opportunity" plans in the fire department); it is also seen in the tenor and agenda of the May, 1980 meeting. The suspicion is confirmed by the specific facts of the selection process at issue. Most compelling is the credible testimony of then-Assistant Chief Devine, a white, who indicated that the Barry administration was keenly aware of the racial balance at the department's highest levels and was prepared to offset his own promotion to fire chief with promotions of blacks to four openings near the top of the departmental hierarchy. Rogers has not credibly denied that his consideration of Devine was conditioned upon race-based promotions. By stating that he and Devine merely discussed black candidates for promotion, he does not begin to explain the fact that Devine reacted to their exchange by turning down the offer to become fire chief.[9] Devine testified that he refused the opportunity because he saw no place in the fire department for race-based promotions.

Objectively viewed, and without taking race into consideration, Kitt and Coleman appear to have been unlikely candidates for promotion in January, 1980. Compared to their fellow officers, they had relatively little experience as acting DFCs, having been given that designation only three months before their promotions. Both

---

9. The fact that Norman Richardson, a black, was ultimately appointed to the fire chief job does not weaken the force of Devine's testimony. The appointment of one black officer to the department's helm would not be viewed by Rogers as achievement of racial balance, especially inasmuch as another white officer joined Devine at the assistant chief level in January, 1980.

In other words, Rogers' desire to appoint blacks to the department's upper tiers remained despite Richardson's appointment. Furthermore, the fact that the October, 1980 promotions were awarded to whites (after the administrative phase of this litigation was underway) is not probative of Rogers' motives and objectives in January, 1980.

ranked behind plaintiffs and numerous others in terms of in-grade seniority, and there is no evidence that they possessed special objective credentials which might otherwise boost them above their peers. Tradition notwithstanding, Rogers was not bound to observe any particular objective criterion in making his selection, but even had he relied on subjective factors, he appears to have given little if any consideration to white candidates. Rogers claims to have considered and spoken with numerous officers in the selection process, but if he interviewed plaintiffs or any other white acting DFC (all of whom had served in that capacity longer than Kitt and Coleman) he cannot recall the occasion. Based on all the evidence, one conclusion is clear: race was "a" "substantial", "significant", "determinative" factor in the selection of Kitt and Coleman, and but for their race, those officers would not have been promoted over their white colleagues in January, 1980.

### b. *The Affirmative Action Defense*

■ In a reverse discrimination case, a finding of race-based promotions is not equivalent to a finding of impermissible discrimination. If the challenged promotions are made pursuant to a legitimate affirmative action plan, there will be no violation of Title VII or section 1981. As an alternative defense, defendants assert that such is the case here. In light of plaintiffs' assertion that the affirmative action defense must be rejected out of hand, an overview of the precedent for defendants' argument is needed.

Courts applying the *Burdine/Aikens* formula to an affirmative action case agree that an employer may rebut a prima facie case of intentional race discrimination by producing evidence that its hiring decision is a consequence of a *legitimate* affirmative action program. The employer cannot simply point to a plan; he must show at least some evidence that the plan is permissible. *See Johnson v. Transp. Agency, Santa Clara County, California*, 748 F.2d 1308, 1310 n. 2 (9th Cir.1984); *Warsocki v. City of Omaha*, 726 F.2d 1358, 1360 (8th Cir.1984).[10] In the public sector, an affirmative action plan must be measured against both constitutional and statutory yardsticks. *See e.g., Hammon v. Barry*, 606 F.Supp. 1082 (D.D.C.1985). To satisfy the equal protection requirement implicit in the Fifth Amendment to the Constitution, *see Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), a public employer's race-conscious employment policy must be substantially related and reasonably tailored to the objective of remedying past discrimination, which discrimination has been found through direct or indirect means by a body (not necessarily a court) competent to make that finding. *See Vanguards of Cleveland v. City of Cleveland*, 753 F.2d 479, 484 (6th Cir.1985) (review of proposed consent decree); *Kromnick v. School District of Philadelphia*, 739 F.2d 894 (3d Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985); *Bratton v. City of Detroit*, 704 F.2d 878 (6th Cir.1983); *see also* Jacobs, Justice Out of Balance: Voluntary Race-Conscious Affirmative Action in State and Local Government ("Justice Out of Balance"); The Urban Lawyer, Vol. 17 No. 1 (Winter 1985) at 17–23. The leading test of reasonableness includes an assortment of factors, no one of which is determinative: whether whites

---

**10.** Under one analysis the *plaintiff* bears the burden of proving the invalidity of the plan relied upon, *see Johnson*, 748 F.2d at 1310 n. 2; *Setser v. Novack Inv. Co.*, 657 F.2d 962, 969 (8th Cir.), *cert. denied*, 454 U.S. 1064, 102 U.S. 615, 70 L.Ed.2d 601 (1981) (private employer); under another the employer cannot prevail upon an affirmative action defense unless he establishes the validity of his affirmative action plan, *see Johnson* 748 F.2d at 1317 (Wallace, J., concurring in part and dissenting in part); *War-*

*socki v. City of Omaha*, 726 F.2d 1358, 1390 (8th Cir.1984) (misquoting *Setser* test in case of public employer). For the reasons expressed in Judge Wallace's separate opinion in *Johnson*, the better view is that, at least in public-employer cases which raise constitutional equal protection concerns, the burden of proving that a race-conscious plan passes constitutional and statutory muster should rest with the employer. However intriguing, this issue need not be resolved here.

are unduly stigmatized by the program, whether the program bears a substantial relationship to the remedy to be achieved, whether no other approach could achieve the same result in the foreseeable future and whether the plan does not "unnecessarily trammel" the interests of white employees. *See Bratton v. City of Detroit,* 704 F.2d at 888–890; *Detroit Police Officers Ass'n v. Young,* 608 F.2d 671, 694–96 (6th Cir.1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981); *see also* Justice Out of Balance at 19. These factors resemble and derive in part from the limits on voluntary affirmative action in the private sector set forth by the Supreme Court in *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). Under *Weber,* Title VII will permit private-sector voluntary affirmative action under the following circumstances, and perhaps others:

> The plan does not unnecessarily trammel the interests of the white employees. The plan does not require the discharge of white workers and their replacement with new black hirees. Nor does the plan create an absolute bar to the advancement of white employees; half of those trained in the program will be white. Moreover, the plan is a temporary measure; it is not intended to maintain racial balance but simply to eliminate a manifest racial imbalance. [Citations omitted.]

*Weber* at 208, 99 S.Ct. at 2726. To the extent that the equal protection test which incorporates and adds to the *Weber* test is the stricter of the two, a public-sector affirmative action plan found to be constitutionally sound does not violate Title VII or section 1981. *Bratton v. City of Detroit,* 704 F.2d at 887; *Britton v. South Bend Community School Corp.,* 593 F.Supp. 1223, 1229 (N.D.Ind.1984) and cases cited therein.

These guidelines for assessing the validity of voluntary affirmative action plans are in no way affected by the holding of *Firefighters Local Union No. 1784 v. Stotts,* — U.S. —, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). In *Stotts,* the Supreme Court faced the issue of

> whether the District Court exceeded its powers in entering an injunction requiring white employees to be laid off, when the otherwise applicable seniority system would have called for the layoff of black employees with less seniority. *Id.* 104 S.Ct. at 2585 (footnotes omitted).

Analyzing the case under Title VII, the Supreme Court held that the consent decree sought to be modified by the injunction did not authorize the court to enjoin the operation of the city's bona fide seniority system and that the court had no power to modify the decree over the city's objection absent proof that the minority employees had been victims of actual discrimination. *See Grann v. City of Madison,* 738 F.2d 786, 795 n. 5 (7th Cir.1984) (summarizing holding of *Stotts* ). The *Stotts* Court identified limits on the underlying district court's powers; it did not address limits imposed under Title VII on the adoption of a *voluntary* program. Indeed, the Supreme Court specifically declined to decide that issue, as follows:

> Finally, the Court of Appeals was of the view that the District Court ordered no more than that which the City unilaterally could have done by way of adopting an affirmative action program. Whether the City, a public employer, could have taken this course without violating the law is an issue we need not decide. The fact is that in this case the City took no such action and that the modification of the decree was imposed over its objection.

— U.S. at —, 104 S.Ct. at 2590 (footnote omitted). *See Van Aken v. Young,* 750 F.2d 43, 45 (6th Cir.1984); *Kromnick v. School Dist. of Philadelphia,* 739 F.2d at 911; *Britton v. South Bend Community School Corp.,* 593 F.Supp. at 1231.[11] *See*

---

11. At least one Justice has recently recognized that *Stotts* does not decide whether and within what statutory limits a public employer may voluntarily adopt an affirmative action plan. *See Bushey v. New York State Civil Service Comm'n,* — U.S. —, 105 S.Ct. 803, 83 L.Ed.2d

*generally Johnson; Hammon v. Barry, supra* (applying *Weber* standards after *Stotts* ).

The above cited cases echo the observation of the Sixth Circuit that

... voluntary affirmative action plans contracted between the parties are easier to defend in the courts than those mandated ab initio by federal trial courts.

*Wygant v. Jackson Bd. of Educ., Jackson, Michigan,* 746 F.2d 1152, 1159 (6th Cir. 1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298 (1985). Moreover, *Stotts* cannot be read to impose an "actual victim" rule if the challenged affirmative action program does not work a deprivation of vested seniority rights. *See e.g. Van Aken v. Young,* 750 F.2d at 45; *Deveraux v. Geary,* 596 F.Supp. 1481, 1486 (D.Mass.1984); *cf. Kromnick v. School Dist. of Philadelphia,* 739 F.2d at 911. Thus, contrary to plaintiffs' belief, defendants' affirmative action defense is not foreclosed by the absence of (1) a judicial finding of past discrimination or (2) a showing that the challenged plans benefit only actual victims of discrimination. Plaintiffs are not entitled to automatic victory on the basis of the *Stotts* decision, and this defense must be examined more closely.

As the parties frame the issue, this case turns on the validity of defendants' 1980 equal employment opportunity plan under the Constitution and Title VII. Accordingly, defendants devote their energies to assessing that plan against the case law set forth above: the *plan's* merit vel non is the centerpiece of their discussion. The Court's analysis has a different starting point and focus.

An affirmative action defense, like any other defense to a Title VII suit, addresses the "ultimate question" of "discrimination vel non", *Aikens,* 460 U.S. at 714, 103 S.Ct. at 1481; *see also Johnson,* 748 F.2d at 136 (Wallace, J., concurring in part and dissenting in part). Therefore,

even the presence of a valid race-conscious plan will constitute a defense to Title VII litigation (or rebut a prima facie case) *only* if the employer acts pursuant to and within the bounds of the plan rather than according to a personal discriminatory agenda. The critical question is whether legitimate affirmative action policies rather than racial animus motivated the race-conscious employment decision at issue. Thus, the threshold question is not whether defendants' 1980 equal employment opportunity plan was permissible under the guidelines outlined above, but whether Elijah Rogers followed that plan in promoting Officers Kitt and Coleman. The evidence presented at trial demonstrates that he did not.

It is noteworthy that Rogers at no time claims to have acted with specific reference to any particular provision of the 1980 plan when he promoted Kitt and Coleman. Although Rogers purported to follow departmental policy and so stated at the May, 1980 meeting (with the concurrence of Mayor Barry), he did not specifically assert that the source of that policy was the documents defendants rely upon here. Even had he done so, it is evident that Rogers' vision of appropriate affirmative action was his own. Although he shared that vision with the mayor, it exceeded the scope of the 1980 plan. Contrary to defendants' implication that the 1980 plan clearly contemplates and provides for race-based promotions, the plan itself contains only very general statements of affirmative action policy. The plan focuses on ways to develop incentives for upward mobility by supporting and encouraging minority members of the department, providing increased training opportunities, eradicating racial discrimination in the department, and improving mechanisms for redress when discrimination does occur. Under optimal conditions such measures would eliminate any need to implement a promotional policy based on racial prefer-

795 (1985) (J. Rehnquist dissenting from denial of *certiorari* ). The constitutionality of a public-sector voluntary affirmative action plan will be addressed by the Supreme Court next term. ——

U.S. ——, 105 S.Ct. 2015, 85 L.Ed.2d 298 (petition for *certiorari* granted in *Wygant v. Jackson Board of Education* ).

ences, as both white and minority sectors of the workforce would attain equal levels of skill, experience and potential for advancement.

In short, the plan's contents mirror its title: they set out "equal employment opportunity" policies, not guarantees of racial balance in the workforce. The words "affirmative action" in the plan's introductory passages do not carry talismanic effect: "affirmative action" in the sense of race-based decisionmaking is simply not contemplated by the plan's language. Unlike the plans challenged in the cases discussed above, *see e.g., Van Aken v. Young; Vanguards of Cleveland v. City of Cleveland; Johnson v. Transp. Agency, Santa Clara County, Calif.; Deveraux v. Geary; Wygant v. Jackson Bd. of Educ.; Kromnick v. School Dist. of Philadelphia; Britton v. South Bend Community School Corp.; Bratton v. City of Detroit, supra,* defendants' 1980 plan does not detail specific steps to *ensure* greater minority representation in the workforce. Instead, it strives for removal of all disincentives and obstacles to minority upward mobility, short of the elimination of competition for promotion, as a means of achieving the desired minority participation at all levels of the department. Defendants *subsequently* enacted plans calling for increasingly "affirmative" action, including an overtly race-conscious promotional system, *see generally Hammon v. Barry, supra;* however, the fledgling equal opportunity policies in place in January, 1980 did not authorize Elijah Rogers or any other official to promote Joseph Kitt or Theodore Coleman by reason of race. Under these circumstances, plaintiffs have met their burden of showing that defendants' consideration of race in the Kitt and Coleman promotions was intentional and impermissible under Title VII and section 1981.

### III. *Responsibility of Individual Defendants*

■ Before addressing the issue of remedies, the Court must decide whether Mayor Barry and City Administrator Rog-

ers bear individual responsibility under section 1981 for the impermissible discrimination found above. In plaintiff Dougherty's related first amendment-based action, *see supra,* n. 5, Judge Hogan declined to impose section 1983 liability on Mayor Barry for the *a mid-1980* discriminatory nonpromotion of Dougherty in that (1) "Mayor Barry [had] delegated to Mr. Rogers the responsibility of selecting those individuals to serve in the rank of Battalion Fire Chief and above" and (2) "there was no evidence proffered that he was involved in the [challenged] decision not to promote plaintiff." *Dougherty v. Barry, supra,* at 1440–1441. Likewise, in this case it is apparent that the mayor delegated the task of filling the January, 1980 deputy chief vacancies to Rogers, and no evidence suggests that Mayor Barry himself participated in the discriminatory selection process, even though he ratified its results at the May, 1980 meeting. In short, these facts do not provide a basis for holding Mayor Barry *individually* liable to plaintiffs under section 1981.

■ Rogers claims that he is protected from individual liability by the doctrine of qualified immunity. Under that doctrine,

government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory rights of which a reasonable person would have known.

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Dougherty v. Barry, supra* n. 5 at 1441; *see also Navy, Marshall & Gordon v. United States International Development-Cooperation Agency,* 557 F.Supp. 484 (D.D.C.1983) (qualified immunity discussed in section 1981 action). The *Harlow* "reasonable person" standard is applied with reference to the status of the law at the time of the alleged prohibited conduct. *Hobson v. Wilson,* 737 F.2d 1, 24 (D.C.Cir. 1984), *cert. denied sub nom, Brennan v. Hobson,* — U.S. —, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *Zweibon v. Mitchell,*

720 F.2d 162, 168 (D.C.Cir.1983), *cert. denied,* — U.S. ——, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984); *Dougherty v. Barry, supra* n. 5, at 1441. As discussed above, in January, 1980 the official policies of the District of Columbia Fire Department did not authorize race-based promotions. Under Title VII, white as well as black employees had a "clearly established statutory right" to nondiscriminatory treatment, *see McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), and Rogers' failure to consider those rights was patently unreasonable. Accordingly, Rogers is not shielded from individual liability by the doctrine of qualified immunity. *See generally Dougherty v. Barry, supra* n. 5, at 1442.

## IV. *Remedies*

 In their Title VII complaint, plaintiffs seek injunctive, declaratory and compensatory relief, in addition to attorney fees and costs. The five remaining plaintiffs who sue separately under section 1981 request only those categories of relief also available under Title VII—there is no demand for punitive damages. Therefore, the question of appropriate relief under section 1981, like the section 1981 liability issue, entirely overlaps the Title VII inquiry.

In view of the findings of fact and conclusions of law set forth at Parts I and II of this opinion, plaintiffs are clearly entitled to a declaratory judgment that they were subjected to unlawful discrimination in the selection process underlying promotions to the District of Columbia Fire Department's deputy chief level in January, 1980. Developments since 1980—including plaintiffs' retirement—have mooted plaintiffs' request for an injunction against further discriminatory treatment. A thornier issue is the extent to which plaintiffs are due retroactive relief.

 The purpose of retroactive relief under Title VII is to make the plaintiff whole; that is, to restore him to the position he would have occupied but for the discrimination, *see e.g., Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–23, 95 S.Ct. 2362, 2372–74, 45 L.Ed.2d 280 (1975); *Patterson v. Greenwood School Dist. 50,* 696 F.2d 293 (4th Cir.1982); *Day v. Mathews,* 530 F.2d 1083, 1085 (D.C.Cir.1976). At the remedial stage of Title VII litigation, unlike at the liability stage, the allocation of burdens of proof favors the plaintiffs: a plaintiff found to have been subjected to disparate treatment is presumed to be entitled to a retroactive remedy unless the defendant can show that he would not have been promoted even absent the discrimination. *Milton v. Weinberger,* 696 F.2d at 98–99; *cf. Toney v. Block,* 705 F.2d at 1370 (Tamm, J., concurring).[12]

 This is the unusual case in which eight plaintiffs have banded together to vie for two positions, each plaintiff claiming that he deserved promotion in January, 1980. As only two positions were available at that time, defendants have definitively shown that at least six plaintiffs would not have received the promotions in question even had the selection process been exemplary. As promotions to deputy chief were based on both subjective and objective factors and followed no clear pattern, the Court has few guidelines by which to evaluate the plaintiffs against each other. Moreover, plaintiffs do not comprise the entire group of officers eligible for promotion to deputy in January, 1980: under D.C.Code § 4–302, any battalion chief in the District of Columbia Fire Department could have received the Kitt or Coleman promotions. Under these circumstances, reinstatement of any one of the plaintiffs at the deputy level would be inappropriate.

Nonetheless, because defendants cannot bear their burden of showing that any particular plaintiff would not have been promoted absent discrimination, an award of retroactive relief in the form of back pay and an annuity adjustment is appropriate.

---

**12.** The majority holding in *Toney v. Block, supra,* addresses allocation of burdens of proof at the remedial stage of a Title VII disparate im-pact action, and does not apply to individual plaintiffs' disparate treatment claims, such as these.

No monetary figure selected by the Court can substitute for the pride and respect of one's colleagues which accompany a hard-earned promotion. Especially for that reason, all efforts must be made to ensure that, as to the more tangible benefits of promotion, each and every plaintiff subjected to discrimination be made not less than whole. A simple division among eight plaintiffs of the monetary value of two promotions would not achieve that goal. Accordingly, and because plaintiffs voluntarily retired in the summer of 1980 and constructive discharge is not an issue,[13] the retroactive relief due them shall be calculated as follows:

(1) For each plaintiff, pre-retirement back pay equal to the difference between battalion chief salary and deputy chief salary for the period from January 24, 1980 to the date of his retirement.

(2) For each plaintiff, post-retirement back pay equal to the difference between his retirement pay drawn to date and the retirement pay due to a deputy chief for the period from the plaintiff's retirement to the present;

(3) For each plaintiff, an annuity adjustment calculated as if a January 24, 1980 promotion to deputy fire chief had taken place.

Plaintiffs have not provided sufficient information to enable the Court to make these calculations. Therefore, the parties are instructed to compute the exact amount of damages owed by defendants, based on the Court's above directive. In addition, the award of retroactive relief due plaintiff Dougherty shall be reduced to the extent that it duplicates elements of the relief awarded by Judge Hogan in *Dougherty v. Barry*, 604 F.Supp. 1424, *supra.*

Seven of the eight plaintiffs have prevailed in this action for purposes of entitlement to attorney fees and costs under 42 U.S.C. § 1988 (all plaintiffs) and Title VII (all plaintiffs except Ford). On or before

May 24, 1985, plaintiffs' counsel shall submit an appropriate application for attorney fees and costs, itemizing all work performed prior to and subsequent to this date, including preparation of the fee application. The defendants shall file opposition, if any, no later than June 17, 1985.

---

13. Plaintiffs raised the issue of constructive discharge for the first time in their pretrial brief. Plaintiffs did not originally complain of constructive discharge and at no time amended their complaints to include that charge; therefore, the issue was stricken from the case at trial.